# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41946

ROBERT ARON KANTOR, )
)
    Plaintiff-Counterdefendant- )    Boise, April 2016 Term
    Respondent, )
)     2016 Opinion No. 99
v. )
)     Filed: September 13, 2016
SONDRA LOUISE KANTOR, )
)     Stephen Kenyon, Clerk
    Defendant-Counterclaimant- )
    Appellant )

---

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Blaine County. Hon. Robert J. Elgee, District Judge.

The judgment of the district court is <u>affirmed</u> in part, <u>reversed</u> in part, and the case is <u>remanded</u> for further proceedings.

Thompson Smith Woolf & Anderson, PLLC, Idaho Falls, for appellant Sondra Kantor. Marty R. Anderson argued.

Ludwig Shoufler Miller Johnson, LLP, Boise, for respondent Robert Kantor. Scot M. Ludwig argued.

---

HORTON, Justice.

This is one of two consolidated cases that Robert and Sondra Kantor appealed to this Court; the other is *Kantor v. Kantor*, Docket No. 42980. This appeal is from the district court's dismissal of Sondra's claim that Robert breached a Property Settlement Agreement (PSA) as a sanction, its grant of summary judgment against her, and its award of attorney fees to Robert. We affirm in part, reverse in part, and remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Robert and Sondra were married for forty-three years before they divorced in 2012. As part of their divorce settlement, Robert and Sondra entered into the PSA on April 25, 2012. The PSA divided the parties' property, including their interests in a number of business entities. The PSA did not result in an entirely clean break between the parties, as a number of Robert and

1

Sondra's joint business ventures remained intact. A judgment of divorce was entered on April 30, 2012. This judgment did not incorporate the PSA.

Although this opinion will refer to other portions of the PSA, the following terms are of particular importance to this appeal:

> **5. REAL PROPERTY:** The parties own real property located at 265 Golden Eagle Drive, Hailey, Idaho.
>
> **5.01** This real property shall be sold as soon as reasonably possible.
>
> **5.02** Pending the sale or disposition of this real property, Robert shall maintain the property and pay all utilities provided to the property....
>
> **5.03** Each party shall provide to the other any information either party receives that may be relevant to the ownership, sale, rental or other disposition of said property.
>
> …
>
> **28. DEBTS AFTER SIGNING OF AGREEMENT: …** In the event Robert shall obtain refinancing of any debts for which Sondra has liability, Sondra shall co-operate in any manner needed to conclude such refinancing after review of the refinancing documents and terms by her attorney and/or accountant.
>
> **29. MISCELLANEOUS PROVISIONS:** …
>
> **28.03** [sic] If action is instituted to enforce any of the terms of this Agreement, then the losing party agrees to pay to the prevailing party all costs and attorneys' fees incurred in that action.

This case initially related to the parties' efforts to sell the community residence which was the subject of Section 5 of the PSA (the property). The parties owed Bank of America approximately $3.4 million on a note secured by the property and another bank $1 million on a home equity line of credit (HELOC), which was secured by a second priority interest in the property. At the time, Bank of America was subject to a consent judgment in an action brought by the Department of Justice. That consent judgment required Bank of America to provide relief to qualifying customers in the form of loan forgiveness and restructuring of debts. The other bank completely forgave the parties' debt on the HELOC. This litigation results from Robert's efforts to seek debt forgiveness and/or restructuring of the $3.4 million obligation to Bank of America which was secured by the property.

In late September of 2012, the parties contracted to sell the property in a short sale for $2.4 million in a cash transaction scheduled to close within 30 days, contingent upon Bank of America's approval of the short sale. The parties were asked to sign a document that extended

the period for the contingency to be satisfied to October 5, 2012. Sondra evidently perceived this as an opportunity to apply leverage to secure Robert's compliance with other terms of the PSA, and she sent him an email indicating that she would not extend the contingency until a number of demands were satisfied.

On October 11, 2012, Robert responded to Sondra's demand by filing a complaint seeking contract damages and injunctive relief due to her failure to sign the extension agreement. Sondra signed the required document later the same day. In November of 2012, Sondra answered Robert's complaint and counterclaimed for breach of contract, an accounting relating to the parties' assets, and fraud. In that same month, the short sale fell through. This was through no fault of the parties; rather, Bank of America had failed to obtain a required appraisal.

In February of 2013, the Kantors entered into a second agreement with the prospective purchasers to sell the property for $2.4 million. Although Bank of America initially approved this short sale in late March, whereby it would have waived a deficiency in excess of $1.4 million, on April 3, 2013, it revoked that approval because Robert was pursuing a loan modification that had potential to result in even more of the parties' debt being forgiven.[1]

In March, Robert moved for partial summary judgment, seeking a declaration that Sondra had breached the PSA by failing to timely sign the extension document and dismissal of Sondra's counterclaims for breach of contract and fraud. Robert's motion was heard on June 24, 2013. The district court granted summary judgment dismissing Sondra's breach of contract (Count I) and fraud (Count III) counterclaims and held that Sondra was obligated to sign the short sale extension document. Robert had argued that the attorney fees he had incurred were damages resulting from Sondra's failure to sign the short sale extension. The district court then ruled:

> So her not signing did not cause the contract -- and I want that underlined, did not cause contract damages. It did provoke a claim for fees, I'll rule on that, but that's a judge issue, it's not a jury issue, so this issue won't go to the jury. That's an issue for the Court to determine who the prevailing party is and whether someone gets fees under a contract, under the divorce contract, or by statute or for some other reason.

On July 18, 2013, Robert moved for an award of attorney fees and costs totaling $19,334.53 based upon the attorney fees provision of the PSA.

---

[1] Bank of America's policies did not permit a debtor to pursue a short sale and loan modification at the same time.

This action then morphed into a dispute over Robert's efforts to obtain a loan modification from Bank of America. On August 7, 2013, the district court entered its order permitting Sondra to amend her counterclaim. On August 9, 2013, Sondra filed an amended answer and counterclaim alleging that, among other things, Sondra had been damaged by Robert's attempts to obtain a loan modification. The same day, both parties sought injunctive relief. Sondra asked the district court to prohibit Robert from further pursuit of the loan modification and to require him to participate in the short sale of the property. Robert asked that Sondra be prohibited "from contacting Bank of America regarding the current financing" of the property.

The parties' respective motions for injunctive relief came before the court on September 12, 2013. There, Robert contended that a loan modification could reduce the parties' $3.4 million debt to $1.5 million. Three witnesses testified, including Sondra. She testified to her trepidation about pursuing the loan modification, expressing concern about letting Robert stay in the property indefinitely and the potential tax consequences of debt forgiveness. Following a recess, the parties announced a stipulation withdrawing their respective motions. Sondra agreed not to contact Bank of America in the four-month period before the scheduled trial, and Robert agreed to diligently pursue a loan modification from Bank of America. The Court entered an order consistent with the parties' stipulation on October 16, 2013.

On October 9, 2013, Robert filed a Motion to Compel Recording of Quitclaim Deed in which he asked that Sondra be required to quitclaim her interest in the property to him. In his supporting affidavit, Robert asserted that Bank of America required that Sondra quitclaim her interest in the property "to complete their loan modification review." Sondra took prompt action to defeat the district court's ability to grant such relief. The next day, Sondra quitclaimed her interest in the property to her boyfriend, Al LaPeter, in exchange for $100 "subject to" the obligation to Bank of America.[2]

On October 17, 2013, Sondra submitted the PSA to the magistrate court in the parties' divorce action and requested that it be incorporated in a supplemental judgment. Proceedings related to this motion gave rise to the companion case in Docket No. 42980.

---

[2] We do not suggest that this transfer actually created any obligation on Mr. LaPeter's part to satisfy the debt to Bank of America.

Robert's motion came before the district court for hearing on November 15, 2013. The district court stated: "What appears to me to be evident is that she has moved her interest away from herself in order to prevent the Court from ordering a transfer of the property to Mr. Kantor." The court then made it clear that it intended to exercise control over the parties to achieve an end that it perceived to be in the parties' best interests:

> I've got a lot of cards that I can play in this. I can say that people that want to play, I can see how this works, and I can impose sanctions. I can throw out people's defenses. I can throw out their cases. I can award attorney's fees. I've got a lot of arrows, and I don't want to sling them at anyone. *I want to try and get what's best for both parties.*
> I told [Sondra's attorney] in chambers, I said if this goes forward, because the parties were having a discussion about it, it is absolutely not going to harm -- to the extent I can prevent it, it's not going to harm Mrs. Kantor. Any benefit that would flow to Mr. Kantor is going to flow half to her because that's the purpose of the order. Whether you call it an order of sale or a contract agreement to sell the property, whatever you call it, that's *the purpose of it is to benefit both parties and to benefit them equally.*

The district court then observed: "I can't order Mr. LaPeter to quitclaim the property back to Mrs. Kantor, but I can order that to the extent possible she has to obtain the property from Mr. LaPeter, obtain a quitclaim deed, and record a quitclaim deed to Mr. Kantor." The district court entered an order to this effect on November 20, 2013.

On November 18, 2013, Sondra delivered a quitclaim deed to Robert's attorney. This document was of little practical value in light of her earlier quitclaim deed to LaPeter. The same day, LaPeter sent an email to the parties' attorneys notifying them that he would not sign a deed to the property.

On November 20, 2013, Robert filed a motion asking for an order that Sondra be declared in contempt for her actions which frustrated his ability to secure a loan modification and imposing civil sanctions. This motion resulted in a bizarre and disturbing response from the district court. On the same date, the district court sent a lengthy email to the lawyers for the parties and the judge assigned to the Kantors' divorce action. This email stated, in part:

> So with the consent and stipulation of Sondra, Mr. Kantor has pursued a loan modification, which, if successful, would result in B of A simply reducing the loan balance, and the information presented to the court is that it would be in the neighborhood of $1M or possibly more. … Mr. Kantor has argued he is on the brink of a successful loan modification arrangement with B of A, and has sought a Quitclaim Deed from Sondra in order to accomplish this goal, for the apparent benefit of both parties. After he filed a motion with this Court requesting the

5

Court order Sondra to quitclaim the property to Bob, on October 10 of 2013, despite the **contractual agreement** to sell the house, Sondra deeded the house to a friend/confidant/person she apparently has a close relationship with, one Al LaPeter. This, obviously, frustrates the contractual obligation of Sondra to sell, which would ordinarily simply result in a cause of action for money damages; however, in this context it has also (arguably) frustrated Mr. Kantor's ability to lower the debt, and sell the house, and also provide both Bob and Sondra Kantor a significant monetary gain.

…

On November 15, after quite a bit of discussion in chambers, and some argument on the record, the Court entered an order directing Sondra to use her best efforts to re-obtain title from Al LaPeter and Quit Claim her interest in the property to Bob Kantor by 10am Monday November 18 so that Bob could pursue a loan modification. By doing so, the Court was hopeful it could alleviate Sondra's concerns regarding "bank fraud", and, despite Sondra's efforts to the contrary, fulfill all of the contract objectives and allow Sondra to achieve some economic benefit in the process. … The Court notes from an exhibit C attached to Mr. Kantor's affidavit ( a letter from [Sondra's attorney]-*who now represents both Sondra and Al LaPeter*) that Mr. LaPeter wishes to inspect the Kantor residence as a tenant in common, requests unqualified access to the property, and that he intends to use the property in accordance with his rights as a property owner.

…

I will tell you right now that I will not be party to a contempt proceeding, and why I have, or will, choose an alternate process. [Sondra's lawyer] knows full well I cannot get at Mr. LaPeter by contempt proceedings. Mr. LaPeter is not a party to the case, and he has not been ordered to do, or not do, anything. Likewise, Sondra Kantor has a built-in defense. She can argue that she begged and pleaded for Mr. LaPeter to QuitClaim his interest back to her, and that he has refused, and there is nothing the Court can do about it. She is probably right. There is no reason to proceed along contempt lines. In addition, it is clear to me that I am probably operating at the outer limits of my authority by even ordering Sondra Kantor to execute a quitclaim deed to Bob Kantor for purposes of a loan modification when the Court's jurisdiction *over the property* is tenuous at best, particularly when the PSA is not merged into the decree, (at least not yet.) I tried to make the contract workable, but I cannot if one party chooses to deliberately frustrate its objectives. *… I wish the parties to know, in advance, exactly what I intend to do if Sondra and Mr. LaPeter choose to continue on the present course.* Sondra Kantor chose to quitclaim the property to Mr. LaPeter, for whatever reasons. She also has a pending counterclaim. If she chooses to resist the Court's current order, either because she is unable to obtain title from Mr. LaPeter, or because she chooses not to execute a satisfactory quitclaim deed to Bob Kantor immediately, *I will summarily dismiss her counterclaim. Summarily. I will not even await nor require a motion from Bob Kantor.* … She will not be allowed to ignore the Court's order, either explicitly or implicitly, and maintain a counterclaim. It will be dismissed with prejudice, as a sanction, for the reasons set forth in this email, and Bob

Kantor may apply for attorney fees as the prevailing party in the pending case against Sondra, and the case will be over. OVER!!

…

Mr. Kantor could apply to the magistrate court for an order merging and incorporating the PSA into the decree of divorce. If that is accomplished, that court unquestionably has jurisdiction over the property, and is probably well within its authority to compel deeds between parties, regulate negotiation of the secured debt on the property, hold parties in contempt as necessary in order to enforce its orders….[3]

(bold, italics, capitalization, "QuitClaim" in original).

In short, the district court recognized that it had issued an order of dubious legality that could not be enforced by way of contempt, yet insisted that if it were not honored the district court would sanction Sondra without notice or an opportunity to be heard.

Sondra responded with an affidavit filed on November 22, 2013, in which she observed:

23. This Court is not in the real estate business. I respectfully submit the Court has no business trying to re-write the PSA with respect to the home. In my opinion, there is no hope for a profit. Our agreement was to get rid of the home by sale and get out of the debt. That was our intent. Bob filed this suit to enforce that very intent and it has evolved into him seeking a loan modification with the Court's indulgence. The Court has acknowledged it is out on a limb but inexplicably keeps pursuing Bob's agenda.
24. The property was not sold by me for only the sum of $100 as represented by the Court. Mr [sic] LaPeter bought the property SUBJECT TO the existing loan of approximately $3.7M including arrearages….

The affidavit was not well-received by the district court. The following day (a Saturday), the district court sent out another lengthy email, again including the magistrate judge assigned to the divorce action[4] among the recipients. If possible, this email was even more extraordinary than its predecessor. The district court stated, in pertinent part:

A short sale has no monetary benefit to either party, though it does relieve both from the dangers of a deficiency action. A loan modification, on the other hand, brings a possibility of economic gain for both parties. Maybe, maybe not. Bob has 65 days to try, and he has been successful already in negotiating a substantial forgiveness of secured debt with another bank. There is little downside to allowing a loan modification **effort**. Sondra avers that Mr. LaPeter took the property subject to the debt, and because of the loan balance he overpaid. That's

---

[3] Given this statement, it should come as little surprise that the district court subsequently affirmed the magistrate court's judgment of contempt in Docket No. 42980.

[4] The magistrate judge assigned to the divorce action recused himself on November 25th, the first business day after the district court sent the email of November 23rd. Although the reason for recusal is not in the record, it can be inferred that the magistrate judge recused himself because of the district court's ex parte communications.

nonsense. Let me know when he starts making loan payments. I doubt he has obligated himself to Bank of America in any fashion.

…

In short, at the moment, Sondra's equity in the house is zero, and she has little to lose by standing by to see if a loan modification is possible.

The first principle here, which Sondra Kantor seems to ignore, is that when you dance with a gorilla you dance as long as the gorilla wants to. The gorilla here is the Bank of America. There is a second gorilla waiting in the wings, and that is the court. **Nothing happens here without bank approval. NOTHING.** There is no equity of Sondra that is at risk. The fact is the *house is in significant default and is subject to being taken by the bank <u>whenever it chooses to do so</u>, and both parties, within 120 days or so, are at risk of a deficiency.* That is an inescapable fact.

…

The Court is in no better position to order a short sale than a loan modification. If it doesn't work, and work soon, the Court has many other options, depending on what the parties choose. That brings up the alternative, which is the Court's power to run things. (The second gorilla in the wings.)

…

<u>Court's exercise of sanctions if the present order is ignored:</u>

As noted before, the Court has tried to facilitate the contract between the parties, so that a sale pursuant to contract may be possible. At present that is not possible, both because of the debt against the house and Sondra's quitclaim deed to Mr. LaPeter. The Court can do nothing about the first matter, but it can about the second. When the issue first came up that Sondra had deeded the house away, the Court's first reaction was that she was attempting to put the house beyond the Court's (and Bob Kantor's) ability to do anything with it, and more importantly, do anything with the debt, (including, most likely, even seeking a short sale.) That suspicion appears to be confirmed. It is clear Sondra wants a short sale, so apparently the plan is to try to push for that, whereby Mr. LaPeter would presumably tender a quitclaim deed in order to accomplish that goal, when and if those two decided that it was convenient or advisable to do so. As I mentioned in the earlier email, I cannot force Sondra to force Mr. LaPeter to do anything. But if Sondra thinks she will be able to put the property beyond the Court's control, essentially ignoring her contract obligations, and most certainly thumbing her nose at the court, and yet she will be entitled to maintain her counterclaim in the same court, she is sadly mistaken. If those facts or suspicions were not enough, the Court's decision to threaten the sanction of dismissal of the counterclaim was cemented when the Court learned of Mr. LaPeter's threats to exercise his rights as a "co-tenant". That, in my view, was an attempt to pour gas on a burning fire, and that prompted my remark about some viewing this legal process as a sporting proposition. Not me. If there is no deed to Bob Kantor carrying Sondra's interest, along with Mr. LaPeters [sic], back to Bob Kantor, and soon, her case goes out the window. Their choice.

(bold, italics, underlining in original).

On December 10, 2013, a hearing was conducted on the district court's proposed sanctions. There, the district court made some interesting observations regarding its powers:

> So I don't believe I'm rewriting the contract. I believe that I am threatening a sanction against her if she continues to make a sale impossible.
>
> As to the contempt issue, I don't have to -- I'm not required to pursue or allow a contempt obligation -- or a contempt proceeding. The contempt power is the Court's to use or to not use. Contempt remedies are ordinarily fines or jail. They involve different, quirky procedural rules. They involve different burdens of proof. They involve rights of the alleged contemnor, things like rights to remain silent. That's an unwieldy process in this context.
>
> In my view, Ms. Kantor is defying the Court, whatever way you put it, and to me it's just like someone declining to produce records or discovery or answer questions at a deposition or to do something like that. If the Court says, no, you produce these things or you answer these questions, and someone says, no, I won't, the Court doesn't have to say, you, you're in contempt and go through a contempt process. The Court can say, look, you're defying my order to do or not do something in a procedural order or whatever you want to call it, you're defying my order to do or not do something in the course of the case, and I get to choose the sanction.
>
> She has moved the title of the property over to a third party deliberately There's no question she moved the title over to a third party deliberately, and in my view, she has done that to frustrate the process. She knows full well contempt won't work because, just as she put in her affidavit, oh, I used my best efforts, Mr. LaPeter won't give me the property back. And that's why I put in the email I choose not to go down that route. I can't hold Mr. LaPeter in contempt. I doubt very seriously if I could hold Ms. Kantor in contempt because I would be ordering to obtain title back from Mr. LaPeter. So I think contempt is useless -- or contempt proceedings are useless under the circumstances.

Following this hearing, the district court entered an order consistent with its earlier email, modified by its recognition that a new magistrate judge was going to entertain Sondra's request to merge the PSA into the earlier divorce decree. Specifically, the district court gave Sondra until three days after the ruling on the merger motion to obtain a quitclaim deed from LaPeter and enjoined her from deeding her interest in the property to any other person. It further ordered that the proposed dismissal of Sondra's counterclaim would be with prejudice as to her ability to pursue a contract action before the district court. The district court recognized that if the magistrate court ordered the PSA merged, then the magistrate court might consider her claims in proceedings before that court.

On December 18, 2013, Robert moved for dismissal of Sondra's counterclaim based upon allegations that Sondra had contact with Bank of America in violation of the district court's order of October 16, 2013. On December 20, 2013, the magistrate court entered a supplemental

9

decree of divorce that merged the PSA into the decree of divorce. On December 20, 2013, Sondra moved for dismissal of the district court action, asserting that the district court lacked subject matter jurisdiction. She did not comply with the district court's order of December 10, 2013.

The parties' pending motions came before the district court for hearing on January 13, 2014. On January 23, 2014, the district court issued its memorandum opinion dismissing Sondra's counterclaim. There the district court stated:

> Sondra's Amended Answer and Counterclaim are hereby dismissed for two reasons. The first reason is as a sanction for failure to abide by, at a minimum, the Court's December 10, 2013 order requiring her to re-obtain title to the real property from Al LaPeter to Sondra so that a sale of the property could be pursued, as previously agreed to by the parties in the marriage settlement contract. The second reason for dismissal is because Sondra requests dismissal, albeit on the grounds this Court lacks subject matter jurisdiction.
> …
> Accordingly, this dismissal is <u>without prejudice</u> to Sondra's pursuing these same claims (raised in her district court counterclaim) before [the magistrate judge assigned to the divorce action]. This dismissal is a bar, and is <u>with prejudice</u>, to Sondra raising any of these same claims in district court as breach of contract action with a claim for money damages, with or without a claim for a right of trial by jury.

(underlining original). On the same day, the district court entered judgment in favor of Robert and dismissing Sondra's counterclaim. Sondra timely appealed.

On February 4, 2014, Robert moved for an award of attorney fees, to which Sondra objected. The motion came before the district court for hearing on April 7, 2014. The district court determined that Robert had prevailed to the extent that it had granted summary judgment holding that Sondra was obligated to sign the short sale extension document, explaining:

> So while he didn't prevail on a claim for monetary damages because of the way the short sale failed, it appeared to be the bank's error, not something that Ms. Kantor caused. But he still got the attorney's fees or he still was a prevailing party because he was required to file to get her to sign, or to get her to deliver the documents that he needed. So on that part I thought he was the prevailing party and I still do.

After that point in the litigation, the district court determined that there were mixed results which did not justify an award of attorney fees:

> Perhaps I should say there wasn't a prevailing party.
> …

10

Mr. Kantor didn't prevail either. So she prevailed as much as he did. It really went out of here as a tie. Nothing got done after the amended counterclaim was filed. Nothing got definitively. I didn't make any determinations that either party really won or didn't win anything.

So when I say each party prevailed in part, that's because the rule says that the court can make that determination. I really probably should have said that there wasn't a prevailing party either way.

Relying upon the attorney fees provision of the PSA, the district court then awarded Robert the $19,334.53 in attorney fees that he had requested following the grant of partial summary judgment. Sondra timely appealed.[5]

## II.    STANDARD OF REVIEW

"Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact." *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010). "This Court reviews other orders imposing sanctions for abuse of discretion." *Telford v. Nye*, 154 Idaho 606, 609, 301 P.3d 264, 267 (2013). "The test for determining whether a judge abused his or her discretion is (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with applicable legal standards; and (3) whether the court reached its decision by an exercise of reason." *Id.* at 610, 301 P.3d at 268.

"When this Court reviews a district court's ruling on a motion for summary judgment, it employs the same standard properly employed by the district court when originally ruling on the motion." *Chandler v. Hayden*, 147 Idaho 765, 768, 215 P.3d 485, 488 (2009). "Summary judgment is proper when there is no genuine issue of material fact and the only remaining questions are questions of law." *Id.* "This Court liberally construes all disputed facts in favor of the nonmoving party and draws all reasonable inferences and conclusions supported by the record in favor of the party opposing the motion." *Id.* This Court may affirm a grant of summary judgment on alternative grounds that were presented to but not relied upon by the district court. *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 145 Idaho 208, 217–18, 177 P.3d 955, 964–65 (2008).

## III.    ANALYSIS

Sondra contends the district court erred by: (1) exercising equitable powers to re-write the PSA; (2) exercising jurisdiction after the magistrate court's order merging the PSA into the

---

[5] Although Robert filed a cross-appeal, the parties subsequently stipulated to a dismissal of the cross-appeal.

judgment in the divorce action;[6] (3) imposing sanctions against Sondra; (4) violating her constitutional rights to access the courts and to a jury trial;[7] (5) granting partial summary judgment in Robert's favor on various issues relating to Robert's duties under the PSA unrelated to the sale of the property; and (6) awarding Robert attorney fees.

## A. The district court erred by re-writing the parties' agreements when it required Sondra to convey her interest in the property to Robert.

Section 5 of the PSA provided:

> **5. <u>REAL PROPERTY</u>:** The parties own real property located at 265 Golden Eagle Drive, Hailey, Idaho.
>
> **5.01** This real property shall be sold as soon as reasonably possible.
>
> **5.02** Pending the sale or disposition of this real property, Robert shall maintain the property and pay all utilities provided to the property....
>
> **5.03** Each party shall provide to the other any information either party receives that may be relevant to the ownership, sale, rental or other disposition of said property.

Paragraph twenty-eight of the PSA provided: "In the event Robert shall obtain refinancing of any debts for which Sondra has liability, Sondra shall co-operate in any manner needed to conclude such refinancing after review of the refinancing documents and terms by her attorney and/or accountant." As previously noted, on September 12, 2013, Sondra agreed to not interfere with Robert's efforts to secure a loan modification:

> Sondra Kantor, or her representative that she has control of, will not contact the B of A about this loan modification or short sale process between now and trial. The short sale will not be pursued between now and trial. And the loan modification will be undertaken as diligently as possible with B of A by Robert Kantor between now and trial.

These are the circumstances that led to the district court's order that Sondra convey her interest in the property to Robert. Sondra argues that the district court effectively rewrote the PSA when it required Sondra to convey her interest in the property to Robert in order to allow him to pursue the loan modification.

---

[6] We do not address this claim other than to note that it has no merit. In the companion case arising from the divorce action, we held that the magistrate court did not have the authority to amend the judgment of divorce by incorporating the PSA because more than nineteen months had passed between the entry of judgment and the Supplemental Decree incorporating the PSA. Our opinion in the companion case under Docket No. 42980 adequately addresses this issue.

[7] We will not address Sondra's constitutional claims because we decide this appeal on different grounds. As a general rule, we will avoid constitutional questions when the case can be decided on other grounds. *See, e.g., Garrity v. Bd. of Comm'rs of Owyhee Cnty.*, 54 Idaho 342, 357, 34 P.2d 949, 956 (1934).

"[W]hen parties to a contract have not agreed to a term essential to determine their rights and duties, the court supplies a term reasonable in the circumstances." *Hull v. Giesler*, 156 Idaho 765, 778, 331 P.3d 507, 520 (2014). However, "courts do not possess the roving power to rewrite contracts in order to make them more equitable." *Losee v. Idaho Co.*, 148 Idaho 219, 223, 220 P.3d 575, 579 (2009). "Equity may intervene to change the terms of a contract if the court finds unconscionable conduct serious enough to justify its interference." *Id.* "It is not sufficient, however, that the contractual provisions appear unwise or their enforcement may seem harsh." *Id.*

We must emphasize that Robert's complaint alleged only a breach of contract based upon Sondra's failure to sign the extension agreement in connection with the first failed short sale. The complaint sought contract damages and injunctive relief, asking either that Sondra be ordered to execute all necessary documents to effectuate that sale or that Robert be given authority to sign on her behalf.

Although the PSA provided that Sondra would "co-operate in any manner needed" to obtain refinancing, her duty to do so arose only "[i]n the event" that Robert obtained refinancing. Robert did not obtain refinancing; he pursued refinancing. The district court's order requiring Sondra to transfer her interest in the property to Robert based upon the court's promise that it would make sure that "[a]ny benefit that would flow to Mr. Kantor is going to flow half to her" cannot be justified by the language of the PSA or the September 12, 2013 stipulation.

The district judge's actions in this case reflect little recognition of the bounds on judicial authority. A district judge presiding over a contract dispute is not a czar empowered to resolve the litigation by fashioning remedies that he or she deems to be in the parties' best interests. The district court erred by requiring Sondra to transfer her interest in the property to Robert.

**B. The district court abused its discretion by dismissing Sondra's case as a sanction.**

The district court dismissed Sondra's answer and counterclaim for two reasons: (1) "as a sanction for failure to abide by, at a minimum, the Court's December 10, 2013 order requiring her to re-obtain title to the real property from Al LaPeter to Sondra so that a sale of the property could be pursued, as previously agreed to by the parties in the marriage settlement contract" and (2) "because Sondra requests dismissal, albeit on the grounds this Court lacks subject matter jurisdiction."

13

The district court's second ground for dismissal of Sondra's counterclaim merits only brief discussion. This was an action for breach of contract and a counterclaim alleging breach of contract and breach of fiduciary duties. "State courts have subject matter jurisdiction over traditional contract actions, a garden variety matter of state common law." *Borah v. McCandless*, 147 Idaho 73, 79, 205 P.3d 1209, 1215 (2009) (quoting *Sinclair & Co., Inc. v. Gurule*, 114 Idaho 362, 364, 757 P.2d 225, 227 (Ct.App. 1988)). Likewise, a district court has subject matter jurisdiction to resolve claimed breaches of fiduciary duties. *Bach v. Miller*, 144 Idaho 142, 144–45, 158 P.3d 305, 307–08 (2007). The void Supplemental Decree entered in the parties' divorce action did nothing to deprive the district court of this jurisdiction.

The district court's dismissal of Sondra's counterclaim as a sanction requires substantially more discussion. Robert defends the district court's action, citing *Greenhow v. Whitehead's, Inc.*, 67 Idaho 262, 175 P.2d 1007 (1946), for the proposition that "dismissal of an action is an appropriate means of a court enforcing its orders." Robert also points to the trial courts' inherent power to assess sanctions for bad faith conduct in litigation.

We initially note that the district court did not identify the source of its authority to impose the sanction. It decided not to use one inherent power of the trial courts: the power to impose sanctions for violations of court orders by way of contempt. *State v. Juarez*, 159 Idaho 91, 94, 356 P.3d 384, 387 (2015). The district court rejected use of its contempt powers because to do so would require that it comply with "quirky procedural rules." We must observe that the "unwieldy" rules that the district court eschewed exist to protect the alleged contemnor's constitutional right to due process of law. *Matter of Williams*, 120 Idaho 473, 478, 817 P.2d 139, 144 (1991).

Robert is correct that "this Court has recognized that trial courts also have an 'inherent authority to assess sanctions for bad faith conduct against all parties appearing before it.' " *State v. Rogers*, 143 Idaho 320, 322, 144 P.3d 25, 27 (2006) (quoting *In re SRBA Case No. 39576*, 128 Idaho 246, 256, 912 P.2d 614, 624 (1995)). In *In re SRBA Case No. 39576*, we cited to *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991), for this proposition. Notably, the United States Supreme Court cautioned that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. In our review of the record, we have been able to identify little "restraint and discretion" on the part of the district court.

The district court rejected use of its contempt powers in part because Sondra had a "built-in defense." The district court's discussion of this "built-in defense" evidenced its recognition that it may have been impossible for Sondra to comply with its order and that a court may only find a person in contempt "only if the contemnor had the present ability to comply with the order violated." *State Dep't of Health & Welfare v. Slane*, 155 Idaho 274, 278, 311 P.3d 286, 290 (2013) (quoting *Camp v. East Fork Ditch Co., Ltd.*, 137 Idaho 850, 865, 55 P.3d 304, 319 (2002)). Imposition of contempt sanctions upon a person who is unable to comply with the order which was violated is a violation of that person's due process rights. *Rodriguez v. Robbins*, 804 F.3d 1060, 1075–76 (9th Cir. 2015), *cert. granted sub nom. Jennings v. Rodriguez*, ___ U.S. ___, 136 S. Ct. 2489 (2016) (citing *Turner v. Rogers*, 564 U.S. 431 (2011)).

Despite this constitutional limitation on its authority, the district court determined that Sondra would be punished if she did not comply with its order. In doing so, the district court likened the proposed sanctions to those that may properly be imposed for violation of discovery orders. In this, the district court erred.

In *Talbot v. Ames Const.*, 127 Idaho 648, 904 P.2d 560 (1995), this Court engaged in a lengthy discussion of the inherent powers of the courts to impose sanctions. We noted that "among the inherent powers of the judicial branch is the authority vested in the courts to protect and maintain the dignity and integrity of the court room and to achieve the orderly and expeditious disposition of cases." *Id*. at 652, 904 P.2d at 564 (citing *Chambers*, 501 U.S. at 43). However, we also noted that we have "adopted rules to provide guidance to the courts in the exercise of these inherent powers." *Id*. Although the district court discussed its power to sanction parties who violate discovery orders, it failed to acknowledge that this Court adopted Idaho Rule of Civil Procedure 37, which describes the circumstances and procedures whereby sanctions may be imposed.

The district court's sanction of dismissing Sondra's counterclaim was not within the boundaries of its discretion and was inconsistent with the applicable governing legal standards. "Due to the extreme nature of a dismissal with prejudice sanction, the trial court must consider three factors." *Lee v. Nickerson*, 146 Idaho 5, 9, 189 P.3d 467, 471 (2008). "The two primary factors are a clear record of delay and ineffective lesser sanctions, which must be bolstered by the presence of at least one 'aggravating' factor, including: 1) delay resulting from intentional conduct, 2) delay caused by the plaintiff personally, or 3) delay causing prejudice to the

15

defendant." *Id.* (quoting *State Ins. Fund v. Jarolimek*, 139 Idaho 137, 139, 75 P.3d 191, 193 (2003)). "The record must show the trial court considered the necessary factors." *Id.* "[T]he consideration of these factors must appear in the record in order to facilitate appellate review." *Jarolimek*, 139 Idaho at 139, 75 P.3d at 193 (quoting *Ashby v. Western Council Lumber Production*, 117 Idaho 684, 686, 791 P.2d 434, 436 (1990)).

Here, the district court did not mention these factors as we have required. Likewise, the district court did not make a finding that Sondra had acted in bad faith. Instead, the district court entered an order that it acknowledged may well not have been within its authority to make and then punished Sondra for violating the order, despite recognizing that she may not have been able to comply with it. Judges may not use their inherent authority to impose sanctions as a salve for feelings wounded by those who, to use the words of the district court, "thumb their noses" at them. We conclude that the district court abused its discretion by dismissing Sondra's counterclaim.

This is not to suggest that there is no remedy for Sondra's behavior. Robert may well have a claim or claims that Sondra breached the PSA and/or the stipulation of September 12, 2013. However, claims for breach of contract are to be decided by a jury, not by the trial court taking it upon itself to force the parties to a resolution that it deems to be in the parties' best interests. On remand, the district court should freely consider granting the parties leave to amend their pleadings to reflect the present status of their controversy in light of Sondra's transfer of her interest in the property.

## C. Sondra has not shown that the district court erred in its grant of summary judgment.

Sondra asserts that the district court erred in granting summary judgment on issues regarding credit card payments, "the Exclusive Resorts password," and airlines miles. These issues are addressed in turn.

The PSA provided that "Robert shall pay the following debts," which included items B and C on an attached Property Debt Schedule. Items B and C were Sondra's Bank of America American Express and Visa credit cards. The district court ruled that Robert did not violate the PSA by making minimum payments on these accounts. Sondra contends that the district court should have imposed a "reasonable time" for payment and she argues it was unreasonable for Robert to make minimum payments because it will take him thirty-five years to pay off her credit card debt at that rate. As previous noted,

Courts do not have the power to rewrite contracts in order to make them more equitable. *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 362, 93 P.3d 685, 693 (2004). A court can reform a contract when a term is unconscionable, but cannot reform a term simply to make a contract fairer. *See id.* at 365, 93 P.3d at 696. However, when parties to a contract have not agreed to a term essential to determine their rights and duties, the court supplies a term reasonable in the circumstances. *Restatement (Second) of Contracts* § 204 (1981). "Where no time is expressed in a contract for its performance, the law implies that it shall be performed within a reasonable time as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance." *Weinstein v. Prudential Prop. & Cas. Ins. Co.*, 149 Idaho 299, 318, 233 P.3d 1221, 1240 (2010) (quoting *Curzon v. Wells Cargo, Inc.*, 86 Idaho 38, 43, 382 P.2d 906, 908 (1963)).

*Hull v. Giesler*, 156 Idaho 765, 778, 331 P.3d 507, 520 (2014). The district court did not err by failing to require Robert to pay off the credit card debt within a specified time. Such an obligation is not "a term essential to determine the rights and duties" of the parties. The PSA simply states Robert shall pay the debt. As our discussion of the district court's efforts to coerce Sondra's cooperation with a loan modification for the benefit of the parties reflects, the district court's duties do not include the responsibility to provide Sondra with a better contract than the one she bargained for.

Next, the PSA provided that Robert was to provide Sondra with a password for Exclusive Resorts, a vacation company that Robert and Sondra had an ownership in. During the course of litigation Sondra claimed that Robert had failed to provide her with the password. However, Sondra's prior counsel represented this "issue is not in dispute between the parties anymore" and the district court dismissed her claim based on this representation. On appeal, Sondra asserts "[t]he district court also granted summary judgment to Robert on the Exclusive Resorts password in error." "Idaho law is well established that 'one may not successfully complain of errors one has consented to or acquiesced in. In other words, invited errors are not reversible.' " *Thomson v. Olsen*, 147 Idaho 99, 106, 205 P.3d 1235, 1242 (2009) (quoting *State v. Caudill*, 109 Idaho 222, 226, 706 P.2d 456, 460 (1985)). To the extent that the district court erred in dismissing the Exclusive Resorts password issue, it was invited error.

Finally, under paragraph 15 of the PSA and a subsequent agreement on September 26, 2012, Robert was supposed to transfer airline miles to Sondra. Sondra argues "[t]he district court wrongfully concluded it granted summary judgement on usage of community airline miles" issue. Sondra cites to discrepancies in the district court's summary judgment ruling, where it

17

initially represented that it was granting summary judgment on the airlines issue but later said Sondra could bring up issues relating to the airline miles and the September 26, 2012, agreement in her amended answer and counterclaim. The district court appears to have dismissed the airline miles issue as advanced in Sondra's initial counterclaim of November 21, 2012,[8] but gave leave to Sondra to advance a claim that Robert was contravening the September 26, 2012, agreement by placing unreasonable restrictions on Sondra's use of her airline miles in her amended answer and counterclaim. Sondra claims that the district court wrongfully concluded the airline miles issue was dismissed when it had explicitly ruled that Sondra could amend her counterclaim to advance the claim.

Sondra is correct in pointing out that the district court did rule that she could proceed with her claim regarding the airline miles. However, Sondra does not challenge the district court's determination that she could proceed with this claim in her amended counterclaim. She only points out discrepancies in its ruling. Thus, although Sondra styles her argument as a claim that the district court erred by granting summary judgment, she has not really argued that an error occurred. It is clear from the record that, but for the imposition of sanctions, the district court was willing to permit her to proceed with this claim. In light of our reversal of the district court's order imposing sanctions, she will be free to proceed with this claim.

## D. We do not address whether the district court abused its discretion by awarding Robert attorney fees.

The district court awarded Robert $19,334.53 in attorney fees under the PSA for the "snapshot in time" before Sondra amended her counterclaim. On appeal, Sondra argues the district court erred in awarding attorney fees. Although we are skeptical of the district court's approach, we do not reach this issue. This case will be remanded for resolution of Sondra's counterclaims against Robert and any additional claims that he might advance against her. Until such time as the parties' respective claims are resolved, there is no prevailing party and the award of attorney fees is vacated. Upon completion of the case, the district court may then determine who prevailed in this litigation. *Bedke v. Pickett Ranch & Sheep Co.*, 143 Idaho 36, 41, 137 P.3d 423, 428 (2006); *Todd v. Sullivan Const. LLC*, 146 Idaho 118, 126, 191 P.3d 196, 204 (2008).

---

[8] The district court's order granting summary judgment dismissed the airline miles issue by dismissing all of count one of Sondra's counterclaim.

In light of the history of the litigation in these companion cases, this Court believes that assignment of a new judge on remand will "eliminate any concern of bias. Therefore, this Court orders that the case on remand be assigned to a new district judge." *Capstar Radio Operating Co. v. Lawrence*, 153 Idaho 411, 424, 283 P.3d 728, 741 (2012).

**E. We do not award either party attorney fees because of the mixed results of the consolidated cases.**

Sondra requests attorney fees under Idaho Code section 12-121 and the terms of the PSA. Robert requests attorney fees pursuant to the PSA. The PSA and Idaho Code section 12-121 allow an award of attorney fees to the prevailing party. In the consolidated cases Robert prevailed on his jurisdictional challenge in Docket No. 42980. However, Sondra prevailed in challenging the district court's imposition of sanctions in Docket No. 41946. Considering the mixed results of the consolidated cases, we hold that there has been no prevailing party on appeal. *See Costa v. Borges*, 145 Idaho 353, 359, 179 P.3d 316, 322 (2008); *Van Brunt v. Stoddard*, 136 Idaho 681, 690, 39 P.3d 621, 630 (2001). Therefore, we do not award costs or fees to either party.

## IV.   CONCLUSION

We reverse the district court's dismissal of Sondra's counterclaim, affirm the district court's rulings on summary judgment, and remand the case for further proceedings. On remand, a new judge shall be assigned to preside over all further proceedings in this case. We do not award costs or fees.

Chief Justice J. JONES and Justices EISMANN, BURDICK and W. JONES, **CONCUR**.

19