# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 49473/49474

| | | |
|---|---|---|
| ADRIAN CARILLO ALCALA, an individual, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUNRIVER OF IDAHO, INC., an Idaho corporation; EMPLOYERS RESOURCE MANAGEMENT COMPANY, an Idaho corporation; EMPLOYERS RESOURCE OF AMERICA, INC., an Idaho corporation; AMERICAN ZURICH INSURANCE COMPANY, an Illinois corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Boise, April 2023 Term |
| VERBRUGGEN PALLETIZING SOLUTIONS, INC., a Delaware corporation; | ) | Opinion Filed: June 14, 2023 |
| | ) | |
| Defendant-Respondent, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| and | ) | |
| | ) | |
| VERBRUGGEN EMMELOORD B.V., an entity existing under the laws of The Netherlands, | ) | |
| | ) | |
| Defendant-Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VOLM COMPANIES, INC., a Wisconsin corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| SUNRIVER OF IDAHO, INC., an Idaho corporation; EMPLOYERS RESOURCE | ) | |

**MANAGEMENT COMPANY, an Idaho**      )
**corporation; EMPLOYERS RESOURCE OF**  )
**AMERICA, INC., an Idaho corporation;** )
**AMERICAN ZURICH INSURANCE**         )
**COMPANY, an Illinois corporation,**    )
                                        )
   **Plaintiffs-Appellants-**            )
   **Cross Respondents,**              )
                                        )
**and**                                 )
                                        )
**ADRIAN CARILLO ALCALA, an**           )
**individual,**                         )
                                        )
   **Plaintiff,**                        )
                                        )
**v.**                                  )
                                        )
**VERBRUGGEN PALLETIZING**              )
**SOLUTIONS, INC., a Delaware corporation;** )
**VERBRUGGEN EMMELOORD B.V., an**        )
**entity existing under the laws of The** )
**Netherlands,**                        )
                                        )
   **Defendants-Respondents-**          )
   **Cross Appellants,**                )
                                        )
**and**                                 )
                                        )
**VOLM COMPANIES, INC., a Wisconsin**    )
**corporation,**                        )
                                        )
   **Defendant.**                       )
_____  )

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Joel E. Tingey, District Judge.

The judgment of the district court is <u>vacated</u>, the decision granting summary judgment is <u>reversed</u>, the decision denying attorney fees is <u>vacated</u>, and the case is <u>remanded</u> for further proceedings.

Racine Olson, PLLP, Pocatello, for Appellant Adrian Carillo Alcala. Scott Smith argued.

2

Hawley Troxell Ennis & Hawley, LLP, Pocatello and Idaho Falls, for Appellants/Cross-Respondents SunRiver of Idaho, Inc., Employers Resource Management Company, Employers Resource of America, Inc., and Zurich Insurance Company. John Bailey, Jr., argued.

Cooper & Larsen, Chartered, Pocatello, for Respondent/Cross-Appellant Verbruggen Palletizing Solutions, Inc. Reed Larsen argued.

Carpenter Law Firm, PLC, Missoula, Montana, for Respondent/Cross-Appellant Verbruggen Emmeloord B.V. Charles Carpenter argued.

_____

BRODY, Justice.

This consolidated appeal arises out of personal injuries Adrian Carillo Alcala ("Carillo") suffered at a potato packaging plant, SunRiver of Idaho, Inc. ("SunRiver"), after his head and shoulders were crushed by a box palletizer designed, manufactured, delivered, and installed by a Dutch company, Verbruggen Emmeloord, B.V. ("VE"), along with its United States affiliate, Verbruggen Palletizing Solutions, Inc. ("VPS"). The box palletizer was one of seven machines SunRiver purchased in a transaction with Volm Companies, Inc. ("Volm"). Because this was a workplace injury, Carillo received worker's compensation benefits through his employers, SunRiver, Employers Resource Management Company, and Employers Resource of America, Inc.—and the surety American Zurich Insurance Company (collectively "the SunRiver Plaintiffs"). Afterwards, the SunRiver Plaintiffs jointly with, and in the name of Carillo, sued Volm, VE, and VPS. Pursuant to a stipulation and compromise agreement, Volm was dismissed from this suit before this appeal.

The district court granted summary judgment to Respondents and dismissed all claims after concluding that VE and VPS were Carillo's statutory co-employees immune from common law liability under _Richardson v. Z & H Construction, LLC_, 167 Idaho 345, 470 P.3d 1154 (2020). On appeal, the SunRiver Plaintiffs and Carillo argue that the transaction between SunRiver and Volm does not make Carillo, VE, and VPS statutory co-employees because it was a "hybrid" transaction consisting of goods with incidental services under _Kelly v. TRC Fabrication, LLC_, 168 Idaho 788, 487 P.3d 723 (2021). VE and VPS cross-appeal the district court's denial of attorney fees under Idaho Code section 12-120(3).

For the reasons set forth below, we agree with the SunRiver Plaintiffs and Carillo. VE and VPS are "third parties" and are not entitled to immunity from suit in tort under the Worker's

3

Compensation Law. The district court's judgment dismissing all claims is vacated, the grant of summary judgment to VE and VPS is reversed, and this case is remanded for further proceedings. We also reject VE's and VPS's argument that the SunRiver Plaintiffs' subrogation interest is barred at summary judgment. There is sufficient evidence in the record to create a disputed issue of material fact over whether the SunRiver Plaintiffs have any comparative fault for Carillo's accident. As for the cross-appeal, we vacate the district court's decision denying attorney fees under section 12-120(3) below because there is not yet a prevailing party. If on remand there ultimately is a prevailing party, the district court may revisit any request for attorney fees under section 12-120(3) at that time.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. *The Parties*

This dispute involves an injured worker (Carillo), the injured worker's direct employer (SunRiver), the seller of the machine that injured the worker (Volm), the foreign manufacturer of the machine (VE), and the manufacturer's United States affiliate (VPS), which assisted the manufacturer with the machine and services related to it. The contractual relationships between the parties can be summarized as follows: SunRiver contracted with Volm ("Equipment Contract") for the purchase of seven machines and parts, along with delivery, design, installation, training, and project management services to integrate the machines into SunRiver's potato packaging operation. The Equipment Contract included four machines from Volm, for which Volm had responsibility under the contract. The Equipment Contract also included three machines to be supplied by VE, for which Volm was apparently a non-exclusive resale distributor according to an informal memorandum of understanding between Volm and VE.

The machine that crushed Carillo, the Verbruggen VPM-BL Box Palletizer ("Palletizer"), was manufactured by VE. Although the purchase order(s) or contract(s) are not in the record, the parties do not dispute that Volm contracted or subcontracted with VE and its United States affiliate VPS to supply three machines promised to SunRiver in the Equipment Contract (including the Palletizer), and to provide the related design, delivery, installation, and training services for those machines. "Both internally, and so far as the customer is concerned, VE acts as a subcontractor to [VPS] with respect to a sale to a [U.S.] customer." The relationships between the parties can be visualized as follows:

4



2. *The Equipment Contract*

SunRiver and Volm executed the Equipment Contract on August 19, 2016, roughly eleven months before Carillo's workplace accident. The Equipment Contract labels SunRiver as the "Buyer" and Volm as the "Seller" of "Services and Equipment" identified in the contract. The Equipment Contract is titled just that: "Equipment Contract"—and refers to itself as an "Equipment Sale Agreement" with a summary of the transaction and incorporated addendums laying out terms related to the machines purchased by SunRiver and the attendant design, delivery, installation, training, and project management services. The total "sell price" of the contract was $1,320,380 before taxes. Within the Equipment Contract, the value of the machines and parts comprised roughly 86% of the contract ($1,131,500), while the design, delivery, installation, training, and project management services totaled roughly 14% ($188,880).

Of the seven machines in the Equipment Contract, the three supplied by VE included: (1) a bag palletizer unrelated to the Palletizer that injured Carillo; (2) a "Carton Accumulation System" that feeds the Palletizer; and (3) the Palletizer that injured Carillo. The Equipment Contract also includes specific terms related to, among other things, contract formation, delivery, installation, shortening the applicable statute of limitations to one year, risk of loss remaining with Volm until delivery is accepted, pricing, and governing law. The Equipment Contract does not contain any language requiring or related to worker's compensation insurance.

Mimicking the payment schedule in the Equipment Contract, VE does not begin manufacturing one of its "standard" box palletizer machines (e.g., the Palletizer) at its factory in the Netherlands until it receives an "order" and the customer has paid "[30%] of the purchase

price." Afterwards, VE will ship the ordered machines upon receiving 65% of the purchase price, i.e., once VE has 95% of the purchase price in hand. Although it is not explicitly laid out in the Equipment Contract, the remaining "installment payment" of 5% is apparently not due until a machine is delivered, installed, "fine tun[ed]," operators are trained, and the machine is "accepted by the buyer and commissioned by VE or VPS[.]"

The Equipment Contract provided that delivery and installation of all seven machines (Volm's and VE's) would occur on January 18, 2017, roughly five months after signing. According to SunRiver, this timeline was important because SunRiver wanted the machines to be operational before the start of its busy potato season in April 2017. Again, although the actual purchase orders or contracts are not in the record, the parties do not dispute that after the Equipment Contract was signed on August 19, 2016, Volm sent a purchase order to VPS that same day to fulfill the portion of the contract related to VE's three machines. Ten days later, on August 29, 2016, VPS sent an internal purchase order to VE to fulfill the purchase order from Volm. What followed was a late delivery of VE's machines, and an installation and commissioning process that spanned roughly five months instead of the typical few weeks.

3. *Execution of the Equipment Contract*

The exact dates appear to be disputed, but it is undisputed that delivery and installation of VE's three machines did not begin until sometime between late February and mid-March 2017, roughly one to two months after the contracted date. Once VE's machines arrived at SunRiver, the long process "of making the equipment work as intended" commenced. For example, in mid-April 2017, VE and VPS discovered that "all of the conveyors for the accumulation system were too narrow." That problem was corrected in late April 2017. By the end of April, the security fencing was installed on the Palletizer, including gates and safety switches that would automatically shut down the system when the gate or fencing was opened. A months-long process of adjusting and fine-tuning the VE machines then began, where VE's and VPS's on-site staff working on the machines would intermittently leave the SunRiver facility to work on other projects. During this time, VE and VPS also gave informal training to SunRiver employees on how the system operated, and SunRiver began to use the Palletizer, allegedly relying on Volm's, VE's, and VPS's "expertise" that the Palletizer would not be left in an unsafe condition while SunRiver's employees operated it pending its full commissioning.

6

Related to this, it is undisputed that during the months-long installation process, staff from VE and VPS would remove or bypass the safety fencing on the Palletizer. It is also undisputed that VPS and VE had a "specific" tool from the supplier of the safety fencing to "quickly" remove the fencing without having to unbolt it from the floor. It is undisputed that the Palletizer's safety fencing could be removed without impeding its ability to operate. It is also undisputed that neither VE nor VPS gave formal training to SunRiver's employees, or the training/user manual, for the Palletizer until after Carillo's accident.

Months into the unfinished installation process, on June 16, 2017, Jeffrey Duffin, the Secretary, General Manager, and partial owner of SunRiver, met with a Volm representative. At the meeting, Duffin expressed SunRiver's "dissatisfaction with on-going delays in getting the equipment to perform as promised." Duffin then "demanded that the ongoing problems be resolved in the near future so that the equipment could be commissioned" and SunRiver's employees "could receive adequate and proper training for safe operation and maintenance of the equipment." Duffin made it "clear" that SunRiver would "remove all of the equipment" from its facility if Volm's "contract[ual] obligations were not met." After this meeting, Volm notified VE and VPS that "[t]his project with our customer at Sun River [sic] is a train wreck and VE's total attention to getting everything corrected is very, very important." In turn, VE and VPS did not finish installing, adjusting, and commissioning the Palletizer until August 1, 2017, i.e., a month and a half later and roughly two weeks after Carillo's accident.

4. *Carillo's Accident and Following Events*

On July 17, 2017, roughly four to five months into the installation process, Carillo suffered "life altering injuries" and complete blindness in both eyes when the Palletizer crushed his head and shoulders as he attempted to correct a misaligned box. During the installation process, there apparently had been ongoing problems with the potato boxes entering the Palletizer in the wrong position. If allowed onto the pallet in the wrong position, the box would stick out or rip, and the pallet would need to be unwrapped, re-stacked, and wrapped again. On the day of Carillo's accident, there were allegedly "more problems" with boxes being incorrectly turned than normal. As a box was entering the Palletizer, Carillo apparently reached out to straighten the misaligned box, and the Palletizer's motor came down and crushed Carillo, trapping him to the frame of the Palletizer. It remains unknown and is apparently disputed *who*

removed or bypassed the safety mechanisms on the Palletizer leading up to, or on the day of Carillo's accident. SunRiver, VE, and VPS all deny responsibility.

An investigation by OSHA two days after the accident culminated in a report that Carillo "may have entered through an unguarded door entry" on the Palletizer to correct the misaligned box when he was injured. According to the OSHA report, Carillo entered the unguarded "equipment fencing" area without hitting the emergency stop. Notably, the Palletizer, and surrounding equipment, was left "as is" by SunRiver so that OSHA could have the "opportunity to view the incident scene as it was on the day of the accident." The OSHA report documents that the Palletizer had "inadequate machine guarding"; that the Palletizer was "missing an interlock gate" and safety fence panels; and that the OSHA investigator "observed two fence pieces" propped up against a wall behind the Palletizer. OSHA later issued two citations to SunRiver for allegedly violating federal safety regulations. Without admitting liability, SunRiver eventually entered into an informal compromise agreement with OSHA.

Roughly two weeks after Carillo's accident, and about four to five months after installation had begun, the accumulator and the Palletizer were commissioned by VE and VPS on August 1, 2017. That day, VE and VPS (with Volm in attendance) provided SunRiver and its employees formal training on the installed VE machines, and for the first time "walked everyone through the manual" for the Palletizer that had been created by VE. Apparently, even on the day of commissioning, "[q]uite a bit of time was spent fine tuning the patterns" to improve the system's functioning. SunRiver also "sign[ed] a commissioning certificate to confirm delivery as per the purchase agreement, after which a software code [was] issued by [VE] to unlock the machine's software permanently." Near the end of the day, Duffin met with Volm representatives and discussed the "large amount of money" the project had cost and requested "some kind of compensation for the lateness and how long the install has dragged out."

## B. Procedural History

After Carillo received worker's compensation benefits, the SunRiver Plaintiffs jointly with, and in the name of, Carillo filed suit against Volm, VE, and VPS as a result of the accident. The SunRiver Plaintiffs and Carillo later amended their complaint and pleaded: (1) breach of contract against Volm; (2) negligence against Volm, VE, and VPS; (3) products liability against Volm, VE, and VPS; (4) breach of an implied warranty against VE and VPS; (5) common law or equitable indemnity against Volm, VE, and VPS; and (6) statutory indemnity or subrogation

under Idaho Code section 72-223(3). The SunRiver Plaintiffs and Carillo also demanded a jury trial, and requested attorney fees "pursuant to Idaho law, including, but not limited to Idaho Code § 12-120."

After discovery, Volm, VE, and VPS moved for summary judgment on all claims. Volm, VE, and VPS generally argued that, among other things, they were entitled to summary judgment dismissing all claims because Volm, VE, and VPS were immune from liability as statutory co-employees of Carillo under *Richardson v. Z & H Construction, LLC*, 167 Idaho 345, 470 P.3d 1154 (2020). Volm, VE, and VPS argued immunity existed because SunRiver was their statutory employer where the "hybrid" transaction between SunRiver and Volm involved "substantial services" in connection with goods sold under *Kelly v. TRC Fabrication, LLC*, 168 Idaho 788, 487 P.3d 723 (2021). Carillo and the SunRiver Plaintiffs filed memorandums in opposition, supported by numerous declarations and deposition excerpts.

After a hearing, the district court issued a written decision granting summary judgment in favor of Volm, VE, and VPS. The district court agreed that the hybrid transaction between SunRiver and Volm involved "substantial services" in connection with the machines sold based on *Kelly*—thereby making SunRiver a category one statutory employer of Volm, VE, and VPS. Because SunRiver was a category one statutory employer of Volm, VE, and VPS—all three entities were statutory co-employees of Carillo under *Richardson* and Idaho Code section 72-209(3), and thereby immune from common law liability. The district court then dismissed all claims against Volm, VE, and VPS without reaching the other arguments raised.

The SunRiver Plaintiffs and Carillo moved for reconsideration, arguing that the district court had erred in analyzing SunRiver as a "category one" statutory employer because SunRiver was required to be treated like the property owner (Fred Meyer) in *Robison v. Bateman-Hall, Inc.*, 139 Idaho 207, 76 P.3d 951 (2003)—and should only have been analyzed under the more limited "category two" statutory employer analysis from *Robison*. The SunRiver Plaintiffs and Carillo essentially argued that the two categories of statutory employers are mutually exclusive based on *Robison*, that SunRiver can only be analyzed as a category two statutory employer, and that SunRiver was not a category two statutory employer of Volm, VE, and VPS under the applicable test. Thus, Volm, VE, and VPS were not statutory co-employees of Carillo entitled to immunity. During this same time, Volm, VE, and VPS also moved for attorney fees against the SunRiver Plaintiffs under Idaho Code section 12-120(3) and for costs as the prevailing parties.

9

While these motions were pending, on December 7, 2021, Volm was dismissed from this action pursuant to a stipulation and compromise agreement between the SunRiver Plaintiffs, Carillo, and Volm. The agreement also withdrew the pending motions for reconsideration as to Volm, and Volm's pending motion for attorney fees and costs. One day later, a hearing on the motions for reconsideration was held between Carillo, the SunRiver Plaintiffs, VE, and VPS. Two days after the hearing, the district court issued a written decision denying the motions for reconsideration, reasoning that SunRiver can be both a category one and category two statutory employer based on this Court's decisions following *Robison*, i.e., the two categories were not mutually exclusive as *Robison* implicitly suggests. A few weeks later, the district court awarded VE and VPS costs as a matter of right but denied each attorney fees under Idaho Code section 12-120(3)—reasoning that the "gravamen" of the claims in the underlying action did not involve an alleged "commercial transaction" between SunRiver, VE, and VPS.

Carillo and the SunRiver Plaintiffs appeal the grant of summary judgment, the denial of their motions for reconsideration, and the award of costs to VE and VPS below. In turn, VE and VPS defend the grant of summary judgment on the grounds reached by the district court, and on other grounds never reached. VE and VPS also cross-appeal against the SunRiver Plaintiffs, arguing the district court erred in denying them attorney fees under Idaho Code section 12-120(3).

## II.  STANDARD OF REVIEW

"When this Court reviews a lower court's ruling on a summary judgment motion, this Court applies the same standard of review the lower court utilized in ruling on the motion." *Richardson v. Z & H Constr., LLC*, 167 Idaho 345, 349, 470 P.3d 1154, 1158 (2020). Summary judgment is proper only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Idaho First Bank v. Bridges*, 164 Idaho 178, 182, 426 P.3d 1278, 1282 (2018). At the summary judgment stage, "[a]ny disputed facts and reasonable inferences are construed in favor of the non-moving party, and the Court freely reviews the questions of law." *Richardson*, 167 Idaho at 349, 470 P.3d at 1158. Likewise, when a party appeals the denial of a motion for reconsideration from a grant of summary judgment, this Court applies the same standard of review. *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). "This Court exercises free review over statutory interpretation because it presents a question of law." *State v. Amstad*, 164 Idaho 403, 405, 431 P.3d 238, 240 (2018).

10

## III. ANALYSIS

**A. The district court's decision that Volm was a statutory co-employee of Carillo does not operate as res judicata or "law of the case" in deciding this appeal.**

The central question on appeal is whether VE and VPS are statutory co-employees of Carillo and, therefore, immune from common law liability under the Worker's Compensation Law. Before we can reach that question, we must address a preliminary procedural argument. VE and VPS argue that because the SunRiver Plaintiffs and Carillo settled with Volm after summary judgment was already entered in favor of Volm, the district court's underlying decision that Volm is an immune statutory co-employee limits our ability to decide whether VE and VPS are statutory co-employees based on res judicata or the "law of the case" doctrine. The SunRiver Plaintiffs and Carillo respond that (1) this argument is improperly raised for the first time on appeal; (2) neither res judicata nor the "law of the case" doctrine applies as a matter of law; and (3) even if res judicata or the "law of the case" doctrine did apply, neither operates as a bar to denying VPS and VE status as immune statutory co-employees of Carillo. For the reasons discussed below, there is no preservation problem and neither res judicata nor the "law of the case" doctrine applies as a matter of law to this appeal.

1. *This procedural-bar argument was preserved for our consideration on appeal.*

It is well-settled that this Court "will not address issues raised for the first time on appeal." *Siercke v. Siercke*, 167 Idaho 709, 715 476 P.3d 376, 382 (2020). "A party must raise both the issue and their position on that issue before the trial court for this Court to review it." *Id*. When raising the issue, "either the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context." *Lingnaw v. Lumpkin*, 167 Idaho 600, 609, 474 P.3d 274, 283 (2020) (quoting *Hansen v. Roberts*, 154 Idaho 469, 476, 299 P.3d 781, 788 (2013)). So long as these requirements are met, "the specific legal authorities used to support the position may evolve." *State v. Hoskins*, 165 Idaho 217, 222, 443 P.3d 231, 236 (2019); *see State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019) ("A groomed horse is expected on appeal, but a different horse is forbidden.").

Here, a stipulation between Volm, the SunRiver Plaintiffs, and Carillo was filed on December 7, 2021—one day before the hearing on Carillo's and the SunRiver Plaintiffs' motion for reconsideration. In the stipulation, the motion for reconsideration against Volm was withdrawn, all claims against Volm were dismissed, and Volm agreed to waive and withdraw its

11

claims for attorney fees and costs. The basis of Carillo's and the SunRiver Plaintiffs' motion for reconsideration was for the district court to revisit its grant of summary judgment to Volm, VE, and VPS; its entry of judgment dismissing all claims in the amended complaint with prejudice; and to determine whether it erred by concluding SunRiver was a category one statutory employer when, according to Carillo and the SunRiver Plaintiffs, our decision in *Robison v. Bateman-Hall, Inc.*, 139 Idaho 207, 76 P.3d 951 (2003), requires SunRiver to be analyzed *only* as a category two statutory employer.

At the hearing on the motion to reconsider, arguments centered around these issues, but near the end, counsel for VE raised the procedural bar argument related to Volm now brought on appeal:

> [COUNSEL FOR VE:] I was going to say, Your Honor, I've thought of the thing that I forgot. You can either hold me to forgetting or let me say it.
>
> THE COURT: All right. Go ahead. Go ahead.
>
> [COUNSEL FOR VE:] Thank you. There's an odd twist here, and that is that Volm is a category one statutory employer; and the challenge to the Court's ruling on that has been withdrawn. And the Verbruggen parties derived status from Volm because we're in the contraction [sic] stream under Volm. I think the effect of withdrawing the challenge to the ruling as to Volm has to be accounted in the briefing, and I think the Court got it right, but I think that adds to it. Thank you.

Carillo and the SunRiver Plaintiffs correctly point out that neither VE nor VPS submitted supplemental briefing to support this argument. However, that is irrelevant. Based on this argument at the hearing, the procedural bar argument VE and VPS now bring on appeal was preserved below because the issue was raised, and the position that Volm's adjudicated status somehow limits Carillo's and the SunRiver Plaintiffs' ability to challenge the statutory co-employee status of VE and VPS was set out before the district court. Counsel for VE and VPS did not refer to res judicata or the "law of the case" doctrine to support their position below as they do now on appeal. However, that is also not critical. While VE and VPS bring a polished legal argument on appeal, it is not a new one. Thus, this issue has been preserved.

2. *Neither res judicata nor the "law of the case" doctrine apply to this appeal.*

Although the issue was preserved, res judicata (claim and issue preclusion) and the "law of the case" doctrine do not—as a matter of law—preclude our consideration of whether VE and VPS are immune statutory co-employees of Carillo. "Claim preclusion bars a subsequent action between the same parties upon the same claim or upon claims 'relating to the same cause of

action . . . which might have been made.' " *Ticor Title Co. v. Stanion*, 144 Idaho 119, 123, 157 P.3d 613, 617 (2007) (quoting *Hindmarsh v. Mock,* 138 Idaho 92, 94, 57 P.3d 803, 805 (2002)). Issue preclusion "applies to protect litigants from the burden of litigating an identical issue with the same party or its privy[,]" *Rodriguez v. Dep't of Corr.*, 136 Idaho 90, 92, 29 P.3d 401, 403 (2001), in "a subsequent action[,]" *Ticor Title Co.*, 144 Idaho at 124, 157 P.3d at 618.

Here, neither claim nor issue preclusion applies to this action and appeal because this is not a "subsequent action" between the same parties or their privies. Moreover, even if we assume the adjudication as to Volm's status as a statutory co-employee of Carillo became final, the issue of Volm's immunity is not "identical" to the issue presented in this appeal: whether *VE* and *VPS* are immune statutory co-employees of Carillo. *See Ticor Title Co.*, 144 Idaho at 124, 157 P.3d at 618 (explaining that for issue preclusion to operate the "issue decided in the prior litigation" must be "identical to the issue presented in the present action"). To the extent VE and VPS attempt to summon defensive non-mutual issue preclusion, it also does not apply because this appeal is not an attempt to relitigate an "identical" issue previously decided by "merely 'switching adversaries.' " *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979) (quoting *Bernhard v. Bank of Am. Nat'l Tr. & Savings Ass'n*, 122 P.2d 892, 895 (Cal. 1942)).

Next, the "law of the case" doctrine does not apply because that doctrine operates *after* a case has proceeded from an initial judgment through to a decision on appeal. The doctrine requires that a "principle" or "rule of law" necessary to the decision on appeal is adhered to "throughout its subsequent progress, both in the trial court and upon subsequent appeal." *ParkWest Homes, LLC v. Barnson*, 154 Idaho 678, 683, 302 P.3d 18, 23 (2013) (citation omitted). It generally applies to decisions by *appellate courts*, whether that decision comes from a district court acting in its intermediate appellate capacity, the Court of Appeals, or this Court. *See Swanson v. Swanson*, 134 Idaho 512, 515, 5 P.3d 973, 976 (2000); *Creem v. Nw. Mut. Fire Ass'n of Seattle, Wash.*, 58 Idaho 349, 352, 74 P.2d 702, 703 (1937); *Brinton v. Johnson*, 41 Idaho 583, 592, 240 P. 859, 861 (1925). Contrary to VE's and VPS's use of the doctrine, we have never held that the decisions of trial courts operate as "law of the case" *against* an appellate court's decision-making in the first appeal, i.e., that it exerts bottom-up constraint on appellate decision-making.

The "law of the case" doctrine is used to bind "the lower court to follow the law as established during the *appeal*, and therefore precludes reopening any issues that were raised on

appeal and passed upon by the appellate court." *Swanson*, 134 Idaho at 517, 5 P.3d at 978 (emphasis added). "[L]ike stare decisis it protects against relitigation of settled issues and assures obedience of *inferior* courts to decisions of *superior* courts." *Frazier v. Neilsen & Co.*, 118 Idaho 104, 106, 794 P.2d 1160, 1162 (Ct. App. 1990) (alteration in original) (emphasis added) (citation omitted); *Berrett v. Clark Cnty. Sch. Dist. No. 161*, 165 Idaho 913, 922, 454 P.3d 555, 564 (2019). Similarly, except for jurisdictional issues, "the law of the case doctrine 'prevents consideration on a subsequent appeal of alleged errors that might have been, but were not, raised in the earlier appeal.' " *State v. Hawkins*, 155 Idaho 69, 72, 305 P.3d 513, 516 (2013) (quoting *Taylor v. Maile*, 146 Idaho 705, 709, 201 P.3d 1282, 1286 (2009)); *see also Frost v. Gilbert*, 169 Idaho 250, 260 n.3, 494 P.3d 798, 808 n.3 (2021) (noting that a decision of the district court which was not appealed in the first appeal became law of the case *after* the appeal).

Thus, the "law of the case" limits the discretion of inferior courts and appellate courts in subsequent appeals. *See, e.g.*, *Matter of Est. of Hirning*, 171 Idaho 146, 156, 519 P.3d 426, 436 (2022). It does nothing to limit an appellate court's discretion to decide issues raised in the first appeal. *See Stuart v. State*, 136 Idaho 490, 495, 36 P.3d 1278, 1283 (2001) ("[T]he law of the case doctrine 'directs a court's discretion, it does not limit the tribunal's power.' " (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))); *see also Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (explaining that the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power" while noting that "[o]f course this [C]ourt, at least, is free when the case comes here").

Here, VE's and VPS's attempt to use the "law of the case" doctrine to bind our hands in deciding this action's first appeal is not only misplaced, but also blurs a fundamental distinction between the law of the case and res judicata: "[law of the case] directs discretion: [res judicata] supersedes it and compels judgment." *S. Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922) ("In other words, in one it is a question of power, in the other of submission."). Despite the invitation to do so, we will not cloud these boundaries. As explained above, res judicata does not apply here; thus, nothing compels or limits our judgment in deciding this appeal. Moreover, because this is the first appeal in this action—from what was an order of the district court granting summary judgment—there is yet to be *any* "law of the case" until today. And, even the law of the case we announce today has its limits. *See, e.g.*, *Berrett*, 165 Idaho at 922, 454 P.3d at 564 (explaining that the reversal of a grant of summary judgment on appeal does not necessarily preclude a trial

14

court on remand from reconsidering a summary judgment ruling when presented with new evidence or a new legal argument).

For these reasons, VE's and VPS's reliance on the dismissal of Volm, and the district court's decision that Volm was an immune statutory co-employee of Carillo, does nothing to curb our judgment in deciding whether VE and VPS are immune statutory co-employees of Carillo. *See also Otts v. Brough*, 90 Idaho 124, 130, 409 P.2d 95, 98 (1965) (explaining that the trial court's adjudications underlying a defendant dismissed on appeal did not create "law of the case" for purposes of the remaining defendant on appeal).

## B. VE and VPS are not statutory co-employees of Carillo because the predominant factor of the Equipment Contract was for the purchase of goods.

This brings us to the central question on appeal: Whether VE and VPS are entitled to immunity from liability as statutory co-employees of Carillo. This question turns on whether SunRiver, the direct employer of Carillo, is a statutory employer of VE and VPS. Applying this Court's analysis in *Kelly v. TRC Fabrication, LLC*, 168 Idaho 788, 487 P.3d 723 (2021), the district court essentially concluded that because VE and VPS rendered "substantial services" for SunRiver under the Equipment Contract in the abstract—regardless of whether the "gravamen" or "predominant factor" of the hybrid transaction was actually for goods—SunRiver was the statutory employer of VE and VPS. On appeal, the parties have reasonable, but widely different readings of our decision in *Kelly*.

The SunRiver Plaintiffs and Carillo argue that, under *Kelly*, when a hybrid transaction is at issue, the focus is on whether the "gravamen" of the transaction is for "goods" or for "services." If the gravamen is for goods, then that hybrid transaction does not confer statutory employer status onto the purchaser (SunRiver) of the goods and services. It is undisputed that the transaction between SunRiver and Volm was a "hybrid" one: it provided for both the purchase and sale of goods—and for design, delivery, installation, project management, and training services related to those goods. *See Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 709, 52 P.3d 848, 854 (2002). From this, the SunRiver Plaintiffs and Carillo argue the gravamen of the hybrid transaction between SunRiver and Volm was for goods; thus, SunRiver is not a statutory employer of VE and VPS—and VE and VPS are not immune statutory co-employees of Carillo.

Conversely, VE and VPS argue that, under *Kelly*, regardless of whether the transaction is hybrid, the focus is not on whether its "gravamen" is for goods or services. Instead, any

transaction involving the sale of goods will confer statutory employer status onto a purchaser if there are "substantial services" rendered in connection with the goods sold. In other words, VE and VPS maintain that *Kelly* created an abstract "substantial services" test—where even if the gravamen or predominant factor of a hybrid transaction is for the sale of goods, the transaction will confer statutory employer status onto a purchaser so long as there are "enough" services.

Based on these competing views, we first clarify our decision in *Kelly,* and then turn to examining the hybrid transaction between SunRiver and Volm.

"The Idaho Worker's Compensation Law is a compromise between injured workers and their employers that provides employees a definite remedy for injuries arising out of and in the course of their employment." *Richardson v. Z & H Constr., LLC*, 167 Idaho 345, 349, 470 P.3d 1154, 1158 (2020). Under the Worker's Compensation Law, the meaning of "employer" is broader than at common law. *Gonzalez v. Lamb Weston, Inc.*, 142 Idaho 120, 122, 124 P.3d 996, 998 (2005); *see* I.C. § 72-102(12)(a). An employee may have more than one employer: the employer who directly hired the employee and any person or entity who, by statute, is also deemed to be the employer for purposes of worker's compensation liability, i.e., a statutory employer. *Richardson*, 167 Idaho at 350–51, 470 P.3d at 1159–60.

Statutory employers are "liable for compensation to an employee of a contractor or subcontractor under him who has not" secured worker's compensation insurance "in any case where such employer would have been liable for compensation if such employee had been working directly for such employer." I.C. § 72-216(1); *see also* I.C. § 72-216(2) (providing that the "contractor or subcontractor shall also be liable for such compensation, but the employee shall not recover compensation for the same injury from more than one party."). In exchange, statutory employers enjoy immunity from liability for common law torts, I.C. §§ 72-201, 72-209, 72-223(1), making the Worker's Compensation Law an injured employee's "exclusive" remedy for injuries occurring in the course of employment. *Richardson*, 167 Idaho at 349–53, 470 P.3d at 1158–62; *Gomez v. Crookham Co.*, 166 Idaho 249, 256, 457 P.3d 901, 908 (2020).

"The immunity granted to employers by the exclusive remedy rule is not limited to statutory employers." *Richardson*, 167 Idaho at 350, 470 P.3d at 1159 (citing *Blake v. Starr*, 146 Idaho 847, 851, 203 P.3d 1246, 1250 (2009)). Under Idaho Code section 72-209(3), immunity also flows to the statutory employees of that statutory employer in an "umbrella-like" fashion. *Richardson*, 167 Idaho at 349–50, 470 P.3d at 1158–59. "Just as the Worker's Compensation

16

Law broadly defines employer, employee is also more broadly defined." *Id*. at 352, 470 P.3d at 1161. A statutory employee can include "any individual, partnership, firm, association, trust, corporation," or limited liability company under the statutory employer. *Id*. at 351, 470 P.3d at 1160 (quoting I.C. § 72-102(24), recodified in I.C. § 72-102(23)). This creates the effect of statutory co-employee immunity under section 72-209(3) for common law liability when employees or statutory employees share a common employer or statutory employer. *See Richardson*, 167 Idaho at 353, 470 P.3d at 1162; *Blake*, 146 Idaho at 851, 203 P.3d at 1250.

However, "Idaho Code section 72-223[(2)] makes it clear that the exclusive remedy rule does not affect an employee's ability to recover damages from certain third parties." *Kelly*, 168 Idaho at 792, 487 P.3d at 727. To set out the scope of tort liability against third parties left undisturbed by the Worker's Compensation Law, Idaho Code section 72-223(1) provides who is "not" a "third party" amenable to suit at common law:

> The right to compensation under this law shall not be affected by the fact that the injury, occupational disease or death is caused under circumstances creating in some person other than the employer a legal liability to pay damages therefor, such person so liable being referred to as the third party. *Such third party shall not include* [(1)] those employers described in section 72-216, Idaho Code, having under them contractors or subcontractors who have in fact complied with the provisions of section 72-301, Idaho Code; nor include [(2)] the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor or for any other reasons, is not the direct employer of the workmen there employed.

I.C. § 72-223(1) (emphasis added).

Under section 72-223(1), the "employers" as described in Idaho Code section 72-216 with "contractors or subcontractors" under them *and* the "owner or lessee of the premises, or other person who is virtually the proprietor or operator of the business there carried on" are all statutory employers as reflected in definition of "employer":

> *"Employer" means any person who has expressly or impliedly hired or contracted the services of another.* It includes [(1)] contractors and subcontractors. It includes [(2)] the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor or for any other reason, is not the direct employer of the workers there employed . . . .

I.C. § 72-102(12)(a) (emphasis added).

17

Since *Robison v. Bateman-Hall, Inc.*, 139 Idaho 207, 76 P.3d 951 (2003), we have separated the definition of "employer" into two categories of statutory employers based on the brackets and symmetrical language above in sections 72-102(12)(a) and 72-233(1). *See, e.g.*, *Venters v. Sorrento Del., Inc.*, 141 Idaho 245, 251, 108 P.3d 392, 398 (2005); *Gonzalez*, 142 Idaho at 123, 124 P.3d at 998; *Fuhriman v. State, Dep't of Transp.*, 143 Idaho 800, 804, 153 P.3d 480, 484 (2007). Both categories have worker's compensation liability and immunity.

Using the first two sentences in the definition of "employer" in section 72-102(12)(a), the first category of statutory employers has been described as "any person who has expressly or impliedly hired or contracted the services of another. It includes contractors and subcontractors." *Fuhriman*, 143 Idaho at 804–05, 153 P.3d at 484–85. Using the third sentence in the same definition, the second category of statutory employers has been described as any person who is "both the owner or lessee of the premises and the virtual proprietor or operator of the business there carried on." *Cordova v. Bonneville Cnty. Joint Sch. Dist. No. 93*, 144 Idaho 637, 641, 167 P.3d 774, 778 (2007); *see Robison*, 139 Idaho at 212; 76 P.3d at 956. Under *Robison*, the second category does not focus only on whether a party contracted for the "services" of another—instead, it *also* asks "whether the work being done pertains to the business, trade, or occupation" of the owner or lessee of the premises. 139 Idaho at 212, 76 P.3d at 956.

In this appeal, the SunRiver Plaintiffs and Carillo have cast into doubt the continuing vitality of the two categories approach flowing from *Robison* where they argue that *Robison* treats the two categories as mutually exclusive—unlike and inconsistent with our later decisions in *Venters*, *Gonzalez*, and *Fuhriman*. However, we need not deal with *Robison* today. Regardless of what category applies to SunRiver, the basic requirement of a contract for "services" cuts across both categories by virtue of the first sentence in section 72-102(12)(a). For the reasons discussed below, the hybrid transaction between SunRiver (the direct employer of Carillo) and Volm (the upstream entity from VE and VPS) does not meet this fundamental requirement.

1. *Whether a hybrid transaction confers statutory employer status turns on whether the predominant factor is the sale of goods or provision of services.*

In *Kelly v. TRC Fabrication, LLC*, we explained that "contracts that include the sale of goods *and* provision of services are within the scope of the 'statutory employer' definition." 168 Idaho 788, 793, 487 P.3d 723, 728 (2021) (emphasis in original) (citing as an example the hybrid transaction for the sale of stumpage and logging services in *Spencer v. Allpress Logging, Inc.*,

18

134 Idaho 856, 11 P.3d 475 (2000)). But we also rejected "the notion that any conceivable service *ancillary* to a contract for the sale of goods automatically brings that contract" within the scope of the statutory employer definition under Idaho Code section 72-102(12)(a). *Kelly*, 168 Idaho at 793, 487 P.3d at 728 (emphasis added). Unlike the hybrid transaction at issue here, *Kelly* was decided in the context of a "contract for the sale of goods in which the only conceivable 'service' is their delivery." *Id.* at 794, 487 P.3d at 729 ("There is no mention of 'services' in the contract.").

Specifically, *Kelly* involved a "routine commercial transaction for the sale of metal tubing"—where the goods were sold "F.O.B. DELIVERED[,]" meaning "title to the goods was retained" by the seller until delivery and acceptance by the buyer. *Id.* at 794–95, 487 P.3d at 729–30. From this we set out a "general rule" and explained that "[d]elivery services ancillary to a contract for the sale of goods do not in and of themselves create a category one statutory employer contractual relationship"—except in two circumstances: (1) "the contract to sell is accompanied by an undertaking to render *substantial services* in connection with the goods sold"; or (2) "where the transaction is a mere device or subterfuge to avoid liability under the Idaho worker's compensation laws." *Id.* at 794, 487 P.3d at 729 (emphasis added).

To determine whether "services" are "substantial" enough to fall within the first exception and make a purchaser a statutory employer, we analyzed whether the "gravamen" of the subject contract was for goods or services, i.e., whether the services were simply "ancillary" or "incidental" to the goods sold. *Id.* at 794–95, 487 P.3d at 729–30. Contrary to VE's and VPS's reading of *Kelly*, the "substantial services" inquiry does not examine whether the services rendered in connection with the goods sold are "substantial" in the abstract. *See id.* (comparing the subject contract with the contract in *Spencer* and concluding that "[t]he services necessary for the completion of the [subject] contract were incidental in relation to the gravamen of the contract, which was the sale of goods"). Thus, the SunRiver Plaintiffs' and Carillo's reading of *Kelly* is correct: the focus is the gravamen of the transaction.

The principle of focusing on a contract as a "whole"—instead of parsing the services in the abstract to confer statutory employer status if the services are "substantial" enough—is also in accord with other jurisdictions' approach to hybrid transactions. *See, e.g.*, *Brothers v. Dierks Lumber & Coal Co.*, 232 S.W.2d 646, 648–50 (Ark. 1950) (holding a contract for the purchase and sale of timber that used the logger as a conduit to "preserve and maintain the National

19

Forest" amounted to "substantial services in connection with the goods sold" to confer "contractor" statutory employer status onto the purchasing lumber mill); *Meyer v. Piggly Wiggly No. 24, Inc.*, 527 S.E.2d 761, 763 (S.C. 2000) (holding that a supermarket was not the statutory employer of an independent bakery's employee who slipped and fell inside the supermarket after the employee had cleaned, delivered, and stocked the supermarket's shelves with the bakery's products because the relationship between the supermarket and the bakery was "vendor-vendee"—not "owner" and contractor or "subcontractor" under S.C. Code section 42-1-400); *Hacker v. Brookover Feed Yard, Inc.*, 451 P.2d 506, 512 (Kan. 1959) (declining to define the "substantial services" exception to the general rule that contracts for purchase and sale do not confer statutory employer immunity while at the same time focusing on whether the overall contractual relationship was that of vendor to vendee).

For these reasons, the "gravamen" approach in *Kelly* is the required lens for determining whether a hybrid transaction confers statutory employer status onto a purchaser. The "gravamen" approach is analytically similar to the familiar "predominant factor" test used in Uniform Commercial Code cases when determining whether a transaction was for goods (in which case the U.C.C. applies) or services (in which case the U.C.C. does not apply). *See, e.g.*, *Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 710, 52 P.3d 848, 855 (2002) (holding the U.C.C. did not apply because the "predominant factors" of the mixed contract were installing, designing, and engineering the fire alarm system, while the specialty goods were "incidental" and "comprised one-half" of the total contract price); *United States v. City of Twin Falls, Idaho*, 806 F.2d 862, 871 (9th Cir. 1986) (holding the U.C.C. applied because the "predominant factor" of a contract for the purchase and installation of sludge disposal equipment at a treatment plant was for "the sale of goods, with a necessary, non-divisible, but incidental services component"), *overruled on other grounds as recognized by Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 551–52 (9th Cir. 1992).

"[A] majority of courts examine all the factors before them, both objective and subjective, to determine the predominant purpose [(i.e., predominant factor)] of a contract." *Linden v. Cascade Stone Co.*, 699 N.W.2d 189, 196 (Wis. 2005). This involves examining the "totality of the circumstances," *id.*, including the contractual language used by the parties, the nature of the businesses involved, the ultimate goal or primary objective of the transaction, and the amounts or ratios paid for the goods and services portions of the contract, respectively. *See*

*id*; *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 799 (Tenn. Ct. App. 2012); *Insul-Mark Midwest, Inc. v. Mod. Materials, Inc.*, 612 N.E.2d 550, 555 (Ind. 1993); *Colo. Carpet Install., Inc. v. Palermo*, 668 P.2d 1384, 1388 (Colo. 1983); *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 833 (4th Cir. 1998); *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 622 (Mich. 1992); *Cranpark, Inc. v. Rogers Grp., Inc.*, 498 F. App'x 563, 568 (6th Cir. 2012).

Whether the predominant factor of a hybrid transaction is for goods or services may involve questions of material fact that must be resolved at trial. *City of Twin Falls, Idaho*, 806 F.2d at 870; *Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304 F. Supp. 2d 971, 976 (S.D. Ohio 2004); *Busch v. Dyno Nobel, Inc.*, 40 F. App'x 947, 955 (6th Cir. 2002); *Higgins v. Lauritzen*, 530 N.W.2d 171, 173 (Mich. Ct. App. 1995); *see, e.g.*, *Urb. Indus. of Ohio, Inc. v. Tectum, Inc.*, 612 N.E.2d 382, 386 (Ohio Ct. App. 1992). The trier of fact, however, should only resolve the predominant factor issue "if there is a true factual dispute, not if the division between goods and services merely involves a close call." *Mecanique C.N.C.*, 304 F. Supp. 2d at 976. Where there are no materially disputed facts relevant to the predominant factor of a hybrid transaction, the predominant factor can be decided as a matter of law. *Higgins*, 530 N.W.2d at 173; *Mecanique C.N.C.*, 304 F. Supp. 2d at 977; *City of Twin Falls, Idaho*, 806 F.2d at 870.

Here, the parties have not pointed to any disputed material facts relevant to the issue of whether the hybrid transaction between SunRiver and Volm was predominantly for the sale of goods or rendition of services. VE and VPS might disagree with the SunRiver Plaintiffs and Carillo as to the ultimate legal conclusion that we should reach based on the facts, but there is no genuine dispute as to what the facts are relevant to this issue. For example, the parties have no dispute over the terms of the Equipment Contract, the nature of SunRiver's, Volm's, VE's, and VPS's businesses, the "ultimate goal" of SunRiver and Volm entering into the Equipment Contract, or the amounts paid for the goods and services portions of the Equipment Contract, respectively. Instead, the only dispute relates to the legal consequences of these undisputed facts.

In this context, it is the function of this Court, and our trial courts, to apply the law to the undisputed facts; thus, we may properly decide the predominant factor of this hybrid transaction as a matter of law. *See, e.g.*, *Fox*, 137 Idaho at 710, 52 P.3d at 855; *Pittsley v. Houser*, 125 Idaho 820, 823, 875 P.2d 232, 235 (Ct. App. 1994); *Mecanique C.N.C.*, 304 F. Supp. 2d at 977 (reaching the same conclusion when the parties simply disagreed on the legal effect of the undisputed facts surrounding a hybrid transaction); *see also Shawver v. Huckleberry Ests.,*

21

*L.L.C.*, 140 Idaho 354, 361, 93 P.3d 685, 692 (2004) ("When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law.").

    2. *The predominant factor of the hybrid transaction between SunRiver and Volm was for the sale of goods, with services only incidentally involved.*

In the instant case, after examining the totality of the circumstances, we conclude that the predominant factor of the hybrid transaction between SunRiver and Volm was for the sale of goods, with services only incidentally involved. Thus, SunRiver (the purchaser) is not the statutory employer of VE and VPS—the contractual entities under Volm (the seller).

Before examining the contractual language, we place it in context of the relationships surrounding the hybrid transaction for the Palletizer and the nature of the businesses involved through the words of SunRiver, Volm, VE, and VPS. According to Marius T. Verbruggen, Director of Business Development for Verbruggen Group B.V. (the parent company of VE and VPS), VE's "sale of an integrated system, including [the Palletizer], to [SunRiver] followed a pattern that was very typical of [VE's] sales through a *distributor*." (Emphasis added.) Volm is the "distributor" here—and Volm has a "memorandum of understanding" with VE and VPS that dubs its "business relationship" with the same a "non-exclusive distributorship." The memorandum is not in the record on appeal but was apparently produced by VPS. The only further hint of its contents in the record comes from the SunRiver Plaintiffs at the hearing on the motion for summary judgment, where their counsel informed the district court, over no dispute or objection from VE and VPS, that the memorandum allowed Volm to "buy" Verbruggen "equipment" (e.g., the Palletizer) "at a discount and then resell it":

> There's no contract between Volm and Verbruggen that I'm aware of other than a very loose—what they refer to or what they expressly state is a nonbinding MoU [Memorandum of Understanding] that allows Volm to buy Verbruggen equipment at a discount and then resell it. That's the only contract I've seen before, and that's—or between them [sic].

Although this statement from counsel is not admissible "evidence" for purposes of deciding the predominant factor of the hybrid transaction between SunRiver and Volm at summary judgment, the declaration of Marius T. Verbruggen read alongside the following chart that VPS provided in response to an interrogatory—showing the chain of orders starting with SunRiver—renders it undisputed that Volm was a non-exclusive resale distributor for VE:

| DATE | TESTIMONY SUMMARY | WITNESS |
|---|---|---|
| August 19, 2016 | Order from SunRiver to Volm | [SunRiver] Owner |

| August 19, 2016 | [Purchase Order] from Volm to VPS | Tom Novak/Volm |
| August 29, 2016 | ITO from VPS to VE | Wouter Verbruggen/VPS |

The course of the transactions as explained by VE confirms this. VE will only manufacture one of its "standard" box palletizers (e.g., the Palletizer) at its factory in the Netherlands with a custom "infeed" and "outfeed" once VE receives an "order" and the "customer" has paid "[30%] of the purchase price." The "customer" ordering the equipment (in this case Volm) then "gets an integrated invoice from [VPS]" which is, when paid, internally allocated between VPS and VE. "Both internally, and so far as the customer [(i.e., Volm)] is concerned, VE acts as a subcontractor to [VPS] with respect to a sale to a U.S. customer." SunRiver—the end-purchaser—was considered a "customer" of Volm, and by indirect extension, also referred to and treated as a "customer" of VE and VPS. Furthermore, the chain of purchase orders above makes it clear that Volm was *also* a "customer" of VPS and VE.

As for the ultimate goal of SunRiver and Volm in entering the Equipment Contract, Michael Hunter, Chief Operating Officer of Volm, testified that Volm contracted with SunRiver "for the purpose of providing Sunriver [sic] various pieces of commercial industrial equipment [(including the Palletizer)] to be used in Sunriver's [sic] wholesale potato and produce packaging business." Likewise, Jeffrey Duffin, the Secretary, General Manager, and partial owner of SunRiver, testified that SunRiver "entered into the Equipment Contract with Volm in order to increase the automation of [its] fresh pack operation." Duffin testified that SunRiver is not in the business of manufacturing or installing automation equipment (like the Palletizer) and does not own the goods necessary to automate its fresh pack operation. In sum, the ultimate goal of the parties here, and the respective nature of their businesses, appears to be a hybrid transaction for the *sale of machines* that are customized to fit a particular facility—between an end-purchaser (SunRiver), a resale distributor (Volm), a foreign manufacturer (VE), and the manufacturer's United States affiliate (VPS).

Turning now to the contractual language used by the parties and the amounts paid for the goods and services portions of the contract, the predominant factor is clearly the sale of goods. To begin, the title of the Equipment Contract focuses on "goods" where it is named just that: "Equipment Contract." Beneath the title, the introductory clause then identifies Volm as the "Seller" and SunRiver as the "Buyer." Notably, parties contracting predominantly for the sale of goods, intending the U.C.C. to govern, often identify themselves using the terms "buyer" and

"seller." *See Jensen v. Seigel Mobile Homes Grp.*, 105 Idaho 189, 192, 668 P.2d 65, 68 (1983). A " '[b]uyer' is one who 'buys or contracts to buy goods' and the 'seller' is one who 'sells or contracts to sell goods.' " *Id*. (emphasis added) (quoting I.C. § 28-2-103(a), (d)).

In the next clause, the Equipment Contract explains that it is an "Equipment *Sale* Agreement" for "Services and Equipment" provided by the "Seller" to the "Buyer":

> Seller agrees to provide the *Services and Equipment* (as such terms are defined below) to Buyer and Buyer agrees to purchase the Equipment and the Services from Seller, all upon the terms and conditions set forth in this *Equipment Sale Agreement*, including Addendums A and B which are attached hereto and incorporated herein by reference (collectively the "Agreement").

(Emphasis added.)

Like the terms "buyer" and "seller," a "sale" is contractual language typically used in a contract governed by the U.C.C., where the transaction "consists in the passing of title [(to goods)] from the seller to the buyer for a price." *See* I.C. § 28-2-106(1). However, even outside the U.C.C., the term "sale" is generally used to denote a transfer of personal or real property. *See, e.g.*, I.C. § 63-3612(1) ("The term 'sale' means any transfer of title, exchange or barter, conditional or otherwise, of tangible personal property for a consideration[.]"); 29 C.F.R. § 541.501(b) (2023) ("Sales within the meaning of section 3(k) of the [Fair Labor Standards Act] include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property."); *Lexington Heights Dev., LLC v. Crandlemire*, 140 Idaho 276, 280–81, 92 P.3d 526, 530–31 (2004) (discussing contracts "for the sale of real property" and the statute of frauds).

Overall, the vast majority of the Equipment Contract's language—including on contract formation, the applicable statute of limitations, delivery and risk of loss, governing law, the absence of any worker's compensation insurance terms, and the overall pricing terms of goods to services—support the conclusion that the predominant factor here is the sale of goods.

First, the contract formation clause includes language which appears to be aimed at a U.C.C. "battle of the forms" dispute regarding possible contract formation issues:

> 1.  Contract Formation. ANY TERMS CONTAINED IN BUYER'S REQUEST FOR PROPOSAL, PURCHASE ORDER, OR ANY OTHER FORM OR COMMUNICATION RECEIVED FROM BUYER (a "Purchase Order") WHICH ARE IN ADDITION TO OR DIFFERENT FROM THE TERMS AND CONDITIONS CONTAINED HEREIN ARE EXPRESSLY OBJECTED TO

24

AND SHALL BE DEEMED REJECTED BY SELLER, UNLESS EXPRESSLY ACCEPTED IN WRITING BY SELLER . . . .

(Capitalization in original.)

To explain, "a typical 'battle of the forms' sale," occurs when "a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving preprinted forms that clash, and contradict each other, on both material and minor terms." *Com. & Indus. Ins. Co. v. Bayer Corp.*, 742 N.E.2d 567, 571 (Mass. 2001). Unlike contracts for services governed by the common law where the acceptance must be a "mirror image" of the offer to form a contract, *S. Idaho Pipe & Steel Co. v. Cal-Cut Pipe & Supply, Inc.*, 98 Idaho 495, 501, 567 P.2d 1246, 1252 (1977), this type of dispute only arises in transactions predominantly for the sale of goods under the U.C.C. (I.C. §§ 28-2-101 to -725)—where a contract can form without the acceptance mirroring the offer, *see, e.g.*, *Rangen, Inc. v. Valley Trout Farms, Inc.*, 104 Idaho 284, 290–91, 658 P.2d 955, 961–62 (1983) (dealing with this type of formation dispute between "merchants"); Thus, this "battle of the forms" language in the Equipment Contract indicates its formation guarded against a dispute under the U.C.C.—as a contract predominantly for goods.

Second, the statute of limitations clause—like the "battle of the forms" clause—plainly anticipates the U.C.C. applying to the entire Equipment Contract. "The longstanding rule in Idaho is that parties may not contract around a statute of limitations." *Drakos v. Sandow*, 167 Idaho 159, 163, 468 P.3d 289, 293 (2020). However, an exception to this rule is provided by law under the U.C.C. when the contract is predominantly for goods: "An action for breach of any contract for sale [brought under the U.C.C.] must be commenced within four (4) years after the cause of action has accrued. By the original agreement *the parties may reduce the period of limitations to not less than one (1) year but may not extend it.*" *Id.* at 163–64, 468 P.3d at 293–94 (emphasis and alteration in original) (quoting I.C. § 28-2-725(1)).

Here, the statute of limitations clause does exactly what the U.C.C. allows—the applicable statute of limitations is reduced by agreement to one year:

> 23. Statute of Limitations. ANY ACTION, WHETHER BASED UPON THEORIES OF BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, OR OTHERWISE, WITH REGARD TO THE GOODS OR SERVICES DELIVERED HEREUNDER *MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.*

(Emphasis added and capitalization in original.)

Accordingly, the inclusion of this clause indicates the parties anticipated the Equipment Contract as being governed by the U.C.C.—as a contract predominantly for the sale of goods.

Third, the Equipment Contract's delivery terms specify that all equipment is "Shipped F.O.B." or free on board to SunRiver's site; Volm is responsible for organizing the delivery of all equipment; and SunRiver is "responsible for cost associated with this delivery." Relatedly, the risk of loss and title terms specify that the "[r]isk of loss to goods will be borne by and title to goods will pass to Buyer [(SunRiver)] from the point and at the time of delivery specified in [this "Delivery" paragraph]." Apparently, Volm handled the delivery and installation of its own equipment, and then "contracted with [VE and VPS] to deliver and install the subject Palletizer at Sunriver's [sic] facility[.]" Nevertheless, like the goods shipped "F.O.B." in *Kelly*—and unlike the stumpage owned by the mills but logged by the landowner in *Spencer*—title to the goods under the Equipment Contract clearly remained in the resale distributor (Volm) until delivery and final acceptance by SunRiver. Thus, the Equipment Contract's delivery terms support the conclusion that the primary objective here was achieving the transfer of title to goods.

Fourth, the governing law clause in the Equipment Contract states it "shall be governed and construed according to" the laws of the "State of Wisconsin" and not the provisions of the United Nations Convention on Contracts for the International Sale of Goods ("C.I.S.G."). From the inclusion of this clause, it is reasonable to infer that because this transaction involved a foreign manufacturer (VE) and its United States affiliate (VPS)—the parties cautioned against application of the C.I.S.G. with the understanding that the Equipment Contract was predominantly for the sale of goods. *See Fercus, S.R.L. v. Palazzo*, No. 98 CIV 7728 (BRB), 2000 WL 1118925, at *3 (S.D.N.Y. Aug. 8, 2000) (explaining that the C.I.S.G. applies when, *inter alia*, contracting parties have places of business in different nations and the contract omits a choice of law provision).

Fifth, unlike a contract predominantly anticipating the rendition of services, the Equipment Contract contains no language requiring either party to carry worker's compensation insurance or concerning such obligations at all. *See Hernandez v. Triple Ell Transp., Inc.*, 145 Idaho 37, 43, 175 P.3d 199, 205 (2007) (dealing with a tractor lease agreement that provided for hauling and unloading services and contained provisions requiring a contractor to carry worker's compensation insurance); *Shriner v. Rausch*, 141 Idaho 228, 230, 108 P.3d 375, 377 (2005) (home construction contractor requiring its subcontractors to carry worker's compensation

insurance); *cf.* I.C. § 72-204 (providing that "employees" and "employers" subject to the Worker's Compensation Law include, among other things, a "person performing *service* in the course of the trade, business, profession or occupation of an employer" (emphasis added)). This absence in the Equipment Contract suggests a transaction in which the rendition of services was merely incidental to the subject of the contract.

Finally, the pricing terms of goods to services in the Equipment Contract support the conclusion that the predominant factor here is the sale of goods. To start, the general pricing term in the contract expressly indicates that all services are "incidental" to the goods sold:

> 6. Pricing. Unless and only to the extent otherwise agreed by Seller, all prices for goods are exclusive of any charges for *packaging, shipping, technical advice, or other necessary services incidental to Seller's performance hereunder*.

(Emphasis added.)

Consistent with this, Volm assured SunRiver that the "warranty period" for a machine under the Equipment Contract "would not start until the machine is commissioned and signed off"—and the Equipment Contract provides that the "[w]arranty work . . . within the warranty period is *included in the purchase price*." (Emphasis added.) Returning to the governing law clause for a moment, it also agrees with the pricing clause's language that all "services" should be construed as incidental to and included within the goods sold:

> 24. Governing Law. . . . . The terms and conditions contained herein shall be applicable [(1)] to sales of goods only, [(2)] to mixed sales of goods and services (regardless of which factor predominates), and [(3)] to sales of services only and, in *either of the latter two cases* [i.e., (2) and (3)], *the term "goods" as used herein shall be construed as including all services rendered hereunder, unless the context clearly indicates otherwise*.

(Emphasis added.)

Turning now to the specific pricing for the goods and services—the total contract price was $1,320,380 with the goods component priced at $1,131,500 (roughly 86% of the total) and the services component priced at $188,880 (roughly 14% of the total). Broken down, the goods component included eight products total (seven machines), with five "Volmpack" products (from Volm) and three "Verbruggen" products (from VE). The five Volm products had a combined purchase price of $298,660. The three VE products (including the Palletizer) had a combined purchase price of $832,840. The services component included "Volm Companies" design services, project management, delivery, installation, and training for all eight products with a

27

combined price of $188,880. Within the services component—for all eight products—Volm charged $8,730 for "Design Services"; $20,000 for "Project Management"; $76,380 for delivery; and $83,770 for installation and training. An addendum to the Equipment Contract then laboriously itemizes the pricing for the three products supplied by VE (totaling $832,840), while at the same time using asterisks to effectively relegate the price of delivery, installation, and training services for the three VE products (totaling $135,880) to the status of a footnote.

Carillo and the SunRiver Plaintiffs rely heavily on the pricing ratio of goods to services, arguing the higher ratio for all goods (86%) versus all services (14%) necessarily makes the services "incidental" to the sale of goods. Although this factor is not dispositive, Carillo and the SunRiver Plaintiffs are correct that the goods to services ratio here indicates the predominant factor is the sale of goods. *Compare Kline Iron & Steel Co. v. Gray Commc'ns Consultants, Inc.*, 715 F. Supp. 135, 136–140 (D. S.C. 1989) (holding the "predominant thrust" of an alleged contract for the "manufacture and erection" of a television tower was for the sale of goods where roughly 26% of the contract price was for services); *and Pittsley*, 125 Idaho at 823, 875 P.2d at 235 (holding the "predominant factor" of a carpet contract was for the sale of goods where roughly 16% of the contract price was for carpet installation services); *with Princess Cruises, Inc.*, 143 F.3d at 833 (holding a contract for repair of a cruise ship's rotor was "principally" for services with "incidental—albeit expensive—parts" where the contract price blended the cost of specialized repair services with the materials used for the repairs).

Although custom design, fine tuning, and training services were involved in this transaction for automation machines, the cost of these services was plainly incorporated into the purchase price of the goods where, particular to VE's machines, each was delivered already designed, free on board, with final "delivery" and "acceptance" occurring only *after* the machines were fully installed, fine-tuned, and commissioned on-site (i.e., ensured to be "conforming" goods). *See Kline Iron & Steel Co.*, 715 F. Supp. at 139 (explaining that "engineering, design, fabrication and inspection should not be characterized as separate services" because "[t]he price of virtually every product sold includes charges for such 'services' ").

According to VE, its box palletizers (i.e., the Palletizer) are sold with the same "parts and dimensions"—while the "infeed" and "outfeed" are customized. The accumulation system sold to SunRiver, which would separate and feed potato boxes into the Palletizer, was actually purchased by VE from another supplier in the Netherlands. As noted above, when VE receives a

purchase order from Volm along with 30% of the purchase price, VE then manufactures the ordered products—and only ships those products after receiving 65% of the purchase price (i.e., when VE has 95% in hand). The remaining installment payment of 5% is not due until the products are delivered, installed, "fine tun[ed]," the operators are trained, *and* the products are "accepted by the buyer and commissioned by VE or VPS[.]" Only once this occurs is the "sale" complete, with title finally passing to SunRiver.

Thus, the design, delivery, installation, and training services here are incidental to the overarching contractual obligation to tender "conforming" goods to SunRiver or risk rejection. *See* I.C. § 28-2-510(1) ("[W]here a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance."); *see, e.g.*, *Beal v. Griffin*, 123 Idaho 445, 449–50, 849 P.2d 118, 122–23 (Ct. App. 1993) (dealing with a buyer's failure to effectively reject a machine as non-conforming). "It is difficult to imagine a commercial product which does not require some type of service prior to its purchase, whether design, assembly, installation, or manufacture." *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 622 (Mich. 1992). On this note, taking an exceptional number of months to finally tender conforming goods does not thereby transmute the predominant factor of a hybrid transaction from the sale of goods into the provision of services.

The Equipment Contract was executed by SunRiver and Volm on August 19, 2016. According to the "Special Notes" in the contract, the delivery and installation of all equipment was scheduled to begin five months later, on January 18, 2017. The purpose of that delivery date was to "ensure that all of the equipment would be installed and working as intended" before April 2017, the start of SunRiver's "busy season" for potato packaging. It is undisputed that delivery and installation of VE's three machines did not begin until late-February or mid-March 2017, roughly two months past the contracted date.

Johan Van Der Reest, VE's Service Manager, testified that "normally" VE and VPS can get an accumulator and palletizer installed, fine-tuned, tested, and commissioned in a number of weeks after delivery. Likewise, Marius T. Verbruggen, the Director of Business Development for VE, testified that it typically takes VE or VPS remaining "onsite for some weeks" after delivery to complete the install, fine tuning, and commissioning of its machines. Yet, in the case of the SunRiver sale, it did not take weeks. Instead, it is undisputed that there was a "long process of

making the equipment work as intended" over the four to five months following delivery—an installation timespan that VE's Service Manager agreed would be "highly unusual[.]"

There is some dispute over exact details, but for purposes of determining the predominant factor of this transaction, the following undisputed facts regarding the install, fine-tuning, troubleshooting, training, and commissioning of VE's machines are enough to conclude that these months-long services were simply delays in achieving the primary objective of the Equipment Contract: the tendering of conforming goods.

From the start, there were problems with the "layout" that Volm had given VE regarding the placement of Volm's "shaker" machine and VE's accumulator. Once the accumulation system was set up in April 2017, it was "discovered that the width of the conveyers [was] too narrow and . . . required modification of the adjustment system to handle the boxes that SunRiver was processing." Apparently the "boxes were too wide"—not because SunRiver changed the size of its boxes after ordering the machines—but because SunRiver filled the boxes so full that they were "bulging out all sides." Thus, making VE's initial design measurements (which apparently did not account for this) incorrect.

Over the installation period spanning the next four months, VE and VPS employees *intermittently* visited the SunRiver facility to fine-tune, troubleshoot, and resolve ongoing issues before the final commissioning of the machines occurred. Part of the fine-tuning and troubleshooting process also involved coordinating with VE's staff in the Netherlands. During this time, VE and VPS provided informal training to some of SunRiver's employees, and SunRiver began operating the machines, including in VE's and VPS's absence. Roughly two months into installation, SunRiver—frustrated with the lack of progress—communicated to Volm that it was necessary for SunRiver to get the purchased machines properly running so that SunRiver could fulfill its own contracts. SunRiver also warned Volm that if installation and commissioning were not completed soon it would cancel the contract, dismantle the equipment, and remove it from the SunRiver facility. Volm agreed to work on solutions with VE and VPS.

Roughly four months into installation, Duffin (Secretary, Manager, and partial owner of SunRiver) met with the director of sales for Volm at Volm's headquarters in Wisconsin. During the meeting, Duffin expressed his "company's dissatisfaction with on-going [sic] delays in getting the equipment to perform as promised." Duffin "demanded" that the ongoing problems be resolved so that the machines could be "commissioned" and again made it "clear" that

SunRiver would "remove all of the equipment" if Volm's contractual obligations were not met. After this meeting, Volm relayed SunRiver's complaints to VE and VPS, and characterized the project as a "train wreck" that needed to be "corrected" and urgently completed:

> This project with our customer at Sun River [sic] is a train wreck and VE's total attention to getting everything corrected is very, very important. There cannot be even a small possibility that the customer sees a lack of attention to correcting all issues from VE or Volm. This attention must be continuous with urgency until complete!

About one month later, in July 2017, VE and VPS were still finishing numerous "punch-list" items for installation, "some of which involved services VE had yet to perform." It was during this month, on July 17, that Carillo's accident occurred, in which he was crushed by the Palletizer while attempting to correct a misaligned box. Two weeks later, on August 1, 2017 (roughly four to five months from the start of installation), the accumulator and Palletizer were finally commissioned, and SunRiver apparently "sign[ed] a commissioning certificate to confirm delivery as per the purchase agreement, after which a software code [was] issued by [VE] to unlock the machine's software permanently."

That same day, VE and VPS (with Volm in attendance) provided SunRiver and its employees with formal training on the installed and commissioned Palletizer, and "walked everyone through the manual" created by VE for the Palletizer. Even on the day of commissioning, "[q]uite a bit of time was spent fine tuning the patterns" to improve the system's functioning. At the end of that day, Volm representatives sat down with Duffin of SunRiver, and Duffin explained "again the large amount of money this project has cost and that he is fair but needs some kind of compensation for the lateness and how long the install has dragged out."

Notably, there is no evidence in the record that during this delayed months-long installation, SunRiver was charged by VE and VPS for "support services" at the hourly rates provided for in the Equipment Contract under "non-warranty services." Instead, as noted above, the "warranty period" for each machine under the Equipment Contract did not "start until the machine [was] commissioned and signed off[,]" and "[w]arranty work" within the warranty period was "included in the purchase price" of the machine. Thus, apart from the 14% of the total contract price for the services component, the months-long services from VPS and VE during the installation period were included in the purchase price of the goods.

31

In sum, under the totality of the circumstances, the predominant factor of the hybrid transaction between SunRiver and Volm was for the sale of goods. Because the predominant factor was for goods and not services, SunRiver is not a statutory employer of VE and VPS because SunRiver does not fall within the definition of an "employer" who "contracted the services" of Volm—the seller contractually above VE and VPS. *See* I.C. § 72-102(12)(a). Thus, the district court erred in concluding that VE and VPS were statutory co-employees of Carillo entitled to immunity under Idaho Code section 72-209(3). Instead, VE and VPS are third parties subject to common law liability under Idaho Code section 72-223(1).

As such, we vacate the judgment in which all claims were dismissed, reverse the grant of summary judgment in favor of VE and VPS, and remand for further proceedings. With this affirmative relief granted to Carillo and the SunRiver Plaintiffs, we do not reach their alternative arguments challenging the grant of summary judgment below.

## C. The subrogation rights of the SunRiver Plaintiffs are not barred because a dispute of material fact remains over whether SunRiver has any comparative fault.

Given our reversal and remand, we nevertheless reach the alternative grounds raised by VE and VPS below and again on appeal for granting summary judgment against the SunRiver Plaintiffs: Whether the SunRiver Plaintiffs' derivative subrogation rights against VE and VPS are barred by SunRiver's alleged comparative fault in the occurrence of Carillo's workplace accident. For the reasons discussed below, the SunRiver Plaintiffs' subrogation rights are not barred at the summary judgment stage because there remain triable and disputed issues of material fact over whether *any* comparative fault can be attributed to SunRiver.

Under Idaho's Worker's Compensation Law, "[i]f compensation has been claimed and awarded, the employer having paid such compensation or having become liable therefor, shall be subrogated to the rights of the employee, to recover against such third party to the extent of the employer's compensation liability." I.C. § 72-223(3). However, under this provision, an employer who has paid compensation benefits to an injured worker is barred from pursuing subrogation against a third party if the employer has any comparative fault for the workplace accident. *Maravilla v. J.R. Simplot Co.*, 161 Idaho 455, 463, 387 P.3d 123, 131 (2016); *Schneider v. Farmers Merch., Inc.*, 106 Idaho 241, 244, 678 P.2d 33, 36 (1983).

Here, VPS and VE argue that the SunRiver Plaintiffs' subrogation rights are barred as a matter of law because no reasonable juror could find that SunRiver had no comparative fault in

contributing to Carillo's workplace injury. VPS and VE argue that SunRiver was negligent per se based on OSHA citations, and that no reasonable employer would, like SunRiver allegedly did, allow its employees to use a "large, dangerous, and unfamiliar" machine before obtaining the operating manual, ensuring the safety guards were in place, and ensuring its employees received adequate training on the machine. The SunRiver Plaintiffs respond that summary judgment on this issue is not appropriate because disputed issues of material fact as to comparative fault remain for a jury to ultimately resolve at trial. The SunRiver Plaintiffs are correct.

Whether comparative fault exists based on negligence is generally for the trier of fact. *Van Brunt v. Stoddard*, 136 Idaho 681, 690, 39 P.3d 621, 630 (2001); *Smith v. Or. Short Line R.R. Co.*, 32 Idaho 695, 700, 187 P. 539, 540 (1920) (stating the same rule under the contributory negligence scheme in existence prior to the enactment of the modern comparative fault statute). Deciding comparative fault "is for the court only when all reasonable people would construe facts in the same way." *See Van Brunt*, 136 Idaho at 690, 39 P.3d at 630. "If the evidence is conflicting on material issues or supports conflicting inferences, or if reasonable minds could reach differing conclusions, summary judgment must be denied." *Cramer v. Slater*, 146 Idaho 868, 873, 204 P.3d 508, 513 (2009) (citation omitted).

Here, granting summary judgment against SunRiver because it bears some comparative fault as a matter of law for Carillo's workplace accident is not appropriate because reasonable minds could reach differing conclusions based on the materially disputed evidence in the record. Contrary to VE's and VPS's assertion, there are no established OSHA "violations" at this point that establish negligence per se (duty and breach) by SunRiver in relation to Carillo's accident. *See Vickers v. Hanover Constr. Co.*, 125 Idaho 832, 835, 875 P.2d 929, 932 (1994) (explaining that "OSHA violations may create negligence per se"). There is an OSHA report and citations in the record against SunRiver for not having the safety guards in place for the Palletizer, and for not developing procedures or enforcing the use of "interlocking gates" to control "potentially hazardous energy" when the Palletizer is being operated or maintained.

However, as the SunRiver Plaintiffs point out, these documents are not conclusive evidence of an established "violation," i.e., the report and citations do not prove liability. When the report and the citations are examined, liability by SunRiver for the alleged OSHA safety violations related to the Palletizer clearly involve complicated and disputed issues of material fact—interrupted by other undisputed material facts. For example, it is undisputed that VE and

33

VPS would bypass the "interlock" mechanism during "testing" to fine-tune the Palletizer. It is undisputed that a safety panel could be removed without impeding the ability of the Palletizer to operate. It is undisputed that VPS and VE had a "specific" tool from the supplier of the safety fencing on the Palletizer to "quickly" remove the fence panels without having to unbolt it from the floor. It is also undisputed that VE and VPS gave SunRiver employees informal training on how to operate the Palletizer during the installation period—but did not give formal training, or the training/user manual for the Palletizer until after Carillo's accident.

Conversely, it is disputed (and apparently unknown) *who* removed/bypassed the safety fencing on the Palletizer—and left it in an unsafe condition—before and on the day of Carillo's accident. It is also disputed whether VE's and VPS's conduct towards and informal training for SunRiver employees during the installation period reasonably represented that the Palletizer was safe to operate with the safety fencing removed/bypassed when VE and VPS would allegedly operate the Palletizer in that condition. It is also disputed whether SunRiver could reasonably rely on VE's and VPS's expertise to leave the Palletizer in a safe condition whenever SunRiver was operating it during the installation period prior to commissioning. Thus, if a juror finds that VE or VPS removed/bypassed the safety fencing on the Palletizer preceding Carillo's accident, left it in an unsafe condition, and that SunRiver reasonably relied on VE and VPS to leave the Palletizer in a safe condition—a reasonable juror could conclude that SunRiver has no comparative fault for Carillo's accident involving the Palletizer.

Furthermore, whether SunRiver was negligent in allowing its employees to use a "large, dangerous, and unfamiliar" machine before obtaining the operating manual, ensuring the safety guards were in place, and ensuring its employees received adequate training on the machine likely goes to the heart of the dispute in this case. Construing all facts and inferences in favor of the SunRiver Plaintiffs (the nonmovants), it could reasonably be found that: (1) preceding Carillo's accident, only VE or VPS had removed/bypassed the safety panels; (2) VE and VPS were aware and allowed SunRiver and its employees to operate the Palletizer to avoid the risk of a rightful rejection by SunRiver due to the delivery and installation delays; (3) SunRiver reasonably relied on the expertise of VE and VPS to not leave the Palletizer in an unsafe condition and to inform SunRiver whenever the Palletizer was unsafe to operate; and (4) VE and VPS failed to alert SunRiver that the Palletizer was in an unsafe condition preceding Carillo's accident.

34

In sum, a reasonable juror could find no comparative fault on the part of SunRiver in Carillo's accident if all facts and inferences are construed in favor of the SunRiver Plaintiffs. Thus, the subrogation rights of the SunRiver Plaintiffs are not barred at the summary judgment stage, and the SunRiver Plaintiffs may proceed with Carillo below.

**D. Carillo's challenge to the award of costs to VE and VPS below is moot because the two separate judgments awarding costs below are already fully satisfied.**

Carillo argues that if this Court determines VE and VPS are not immune from third party liability as statutory co-employees, reverses the grant of summary judgment, and vacates the judgment entered, then VE and VPS are not "prevailing parties" below and the award of costs below should also be reversed. Typically, Carillo would be correct. However, there was a full satisfaction of the separate judgments awarding costs below, making this issue moot.

After entering judgment related to the grant of summary judgment in favor of VE and VPS dismissing all claims, the district court awarded costs as a matter of right to VE in the amount of $2,114 and VPS in the amount of $2,032.54 as prevailing parties below and entered separate judgments for each award. Relevant to Carillo's argument on appeal, if a party is no longer the prevailing party below by decision of this Court on appeal, and costs were awarded below as a matter of right under Idaho Rule of Civil Procedure 54(d)(1)(A), then the award of costs "must be" vacated. *Nye v. Katsilometes*, 165 Idaho 455, 464, 447 P.3d 903, 912 (2019).

However, there is an exception to this rule. "When a judgment debtor voluntarily pays the judgment, the debtor's appeal becomes moot, and it will be dismissed." *Quillin v. Quillin*, 141 Idaho 200, 202, 108 P.3d 347, 349 (2005) (holding that the voluntary payment of a balance owed on a judgment for the division of community property rendered the appeal from the judgment which challenged that division moot). If a judgment debtor wants to preserve his ability to challenge a monetary award on appeal, the judgment debtor may deposit the amount due under the judgment to the clerk of the court pursuant to Idaho Code section 10-1115. *Id*. Here, the face of the two filings titled "Satisfaction of Judgment" do not reflect deposits pursuant to section 10-1115. Instead, each reflects a full accord and satisfaction between the parties on the award of costs to VE and VPS below. Thus, we will not vacate the award of costs below to VE and VPS because Carillo's challenge to the award is moot.

**E. The district court's decision denying VE and VPS attorney fees below under Idaho Code section 12-120(3) is vacated because there is not yet a prevailing party below.**

In its decision below, the district court determined that VE and VPS "prevailed inasmuch as the claims against them were dismissed[,]" but denied VE and VPS attorney fees under Idaho Code section 12-120(3) against the SunRiver Plaintiffs. Although the district court appears to have examined the "gravamen" of the *action*—instead of evaluating the "gravamen" of each *claim* in the amended complaint—it essentially reasoned that all the claims in the underlying action dealt with "issues of negligence and malfeasance." Notably, the district court recognized the commercial "setting" of the claims—but concluded that there was no direct contractual relationship between VE, VPS, Carillo, and the SunRiver Plaintiffs, and that the claims in this action were otherwise adjudicated under the Idaho's Worker's Compensation Law. Thus, the district court concluded there was no alleged "commercial transaction" forming the basis of any claims that could allow for an award of fees to VE and VPS under section 12-120(3).

On cross-appeal, VE and VPS argue the district court erred in denying fees because the SunRiver Plaintiffs are vindicating contractual rights through a subrogation right; the SunRiver Plaintiffs "asserted a claim for breach of implied warranty, and itself asserted the applicability of [Idaho Code section] 12-120(3) in its amended complaint"; and "the gravamen of [the] lawsuit was a commercial transaction, not the Worker's Compensation Law." In response, the SunRiver Plaintiffs argue that this cross-appeal by VE and VPS is not only meritless, but their arguments in support of their section 12-120(3) claim for fees is frivolous, unreasonable, and without foundation considering our precedent. In essence, the SunRiver Plaintiffs argue precedent shows there must be a direct "commercial transaction" alleged between the parties for there to be a basis for an award of fees under Idaho Code section 12-120(3).

There is no need to reach the merits of this cross-appeal because we instead vacate the district court's decision denying fees because there is not yet a prevailing party below based on the outcome of this appeal. *See Portfolio Recovery Assocs., LLC. v. MacDonald*, 162 Idaho 228, 236, 395 P.3d 1261, 1269 (2017); *see also Nye*, 165 Idaho at 464, 447 P.3d at 912. Like our instructions to the district court in *Portfolio Recovery*, if there ultimately is a prevailing party below on remand, the district court may revisit whether there is a legal basis for an award of fees to the prevailing party under Idaho Code section 12-120(3). Although we do not reach the merits, we nevertheless pause to explain that the cross-appeal here was not frivolous, unreasonable, or

without foundation for the limited purpose of denying the SunRiver Plaintiffs' request for fees on cross-appeal under Idaho Code section 12-121. As explained below, contrary to the SunRiver Plaintiffs' position, VE's and VPS's cross-appeal requires distinguishing, overturning, or potentially reconciling case law plainly in tension under section 12-120(3).

Idaho Code section 12-120(3) provides that the prevailing party "[i]n any civil action to recover on . . . a commercial transaction . . . shall be allowed a reasonable attorney's fee" to be set by the court, to be taxed and collected as costs. *See Knudsen v. J.R. Simplot Co.*, 168 Idaho 256, 272, 483 P.3d 313, 329 (2021) (alteration in original) (quoting I.C. § 12-120(3)). The award of attorney fees under Idaho Code section 12-120(3) "is not warranted every time a commercial transaction is remotely connected with the case." *Brooks v. Gigray Ranches, Inc.*, 128 Idaho 72, 78–79, 910 P.2d 744, 750–51 (1996) (citation omitted). Instead, "recovery of attorney's fees under section 12-120(3) hinges on 'whether the gravamen of a claim is a commercial transaction.' " *Knudsen*, 168 Idaho at 272, 483 P.3d at 329 (quoting *Sims v. Jacobson*, 157 Idaho 980, 985, 342 P.3d 907, 912 (2015)).

The "commercial transaction" and "gravamen" analysis under section 12-120(3) is done claim by claim. *Sims*, 157 Idaho at 985, 342 P.3d at 912; *Great Plains Equip., Inc. v. Nw. Pipeline Corp.*, 136 Idaho 466, 472, 36 P.3d 218, 224 (2001). Neither a contract, *Blimka v. My Web Wholesaler, LLC*, 143 Idaho 723, 728, 152 P.3d 594, 599 (2007), nor a commercial transaction *in fact* are necessary predicates to awarding attorney fees under a claim that qualifies for fees under section 12-120(3), *Garner v. Povey*, 151 Idaho 462, 470, 259 P.3d 608, 616 (2011). Instead, "a prevailing defendant can recover attorney fees under [section] 12–120(3) if the opposing party's complaint alleges a claim seeking to recover on a commercial transaction, even though it fails to prove that such transaction occurred." *Garner*, 151 Idaho at 470, 259 P.3d at 616.

With this in mind, "when a complaint alleges (1) *the parties* entered a commercial transaction <u>and</u> (2) that transaction entitles the plaintiff to attorney fees under Idaho Code section 12-120(3), the plaintiff is estopped from later attempting to abandon this position." *Terrell v. Paradis de Golf Holding, LLC*, __, Idaho __, __, 527 P.3d 480, 484 (2023) (italics added and underline in original) (explaining this issue in *Garner v. Povey*, 151 Idaho 462, 259 P.3d 608 (2011) and reaffirming this principle). Consistent with this principle, we have held that "only the *parties to the commercial transaction* are entitled to attorney fees under I.C. § 12-120(3)."

*Printcraft Press, Inc. v. Sunnyside Park Utilities, Inc.*, 153 Idaho 440, 461–62, 283 P.3d 757, 778–79 (2012) (emphasis added) (denying fees under I.C. § 12-120(3) where there were "several commercial transactions that created the circumstances underlying the claims" because "none of those transactions [were] between the parties" requesting attorney fees).

On this note, we have held that Idaho Code section 12-120(3) cannot be "invoked if the commercial transaction is between parties only indirectly related, i.e. [where] there was no [alleged] transaction *between the parties*[.]" *Great Plains Equip., Inc.*, 136 Idaho at 472, 36 P.3d at 224 (emphasis in original); *see, e.g.*, *Printcraft Press, Inc.*, 153 Idaho at 461, 283 P.3d at 778 ("[A] commercial transaction *between the parties* to the lawsuit must form the basis of the claim." (emphasis added)); *Brower v. E.I. DuPont De Nemours & Co.*, 117 Idaho 780, 784, 792 P.2d 345, 349 (1990) (holding that because the plaintiff purchased the product from a local co-op, not the defendant herbicide manufacturer, the case did not involve a "commercial transaction sufficient to implicate the terms of I.C. § 12-120(3)"); *Hausam v. Schnabl*, 126 Idaho 569, 575, 887 P.2d 1076, 1082 (Ct. App. 1994) (holding that based on *Brower*, fees were not available under I.C. § 12-120(3) when there was no direct "commercial transaction" alleged between the party requesting fees and the party who would pay).

On the other hand, in a case relied on by VE and VPS—*American West Enterprises, Inc. v. CNH, LLC*, 155 Idaho 746, 316 P.3d 662 (2013)—a different approach was taken. In *American West*, we held that a manufacturer was entitled to an award of fees under section 12-120(3) despite the manufacturer being in an *indirect* relationship with the purchaser by way of the seller. *Id.* at 755, 316 P.3d at 671. To reach this conclusion, we reasoned that the purchaser had alleged the manufacturer "breached an implied warranty, which would be a commercial transaction"; tried to recover on the "commercial nature of a transaction: breach of an implied warranty"; claimed it was a third party beneficiary of the direct "commercial agreement" between the seller and the manufacturer; and "claimed it was entitled to attorney fees pursuant to [Idaho Code section] 12-120(3) because this was a commercial transaction." *Id*. Thus, *American West* is in direct tension with our standard in *Garner, Terrell*, *Printcraft Press*, *Great Plains*, and *Brower* that a *direct* "commercial transaction" must be alleged between the "parties" for there to be a legal basis to award fees under Idaho Code section 12-120(3).

Here, relying on *American West*, VE and VPS attempt to estop the SunRiver Plaintiffs from denying that they sufficiently alleged a "commercial transaction" for purposes of fees under

section 12-120(3) because the amended complaint contains both a breach of an implied warranty claim against VE and VPS and a request for attorney fees under "Idaho Code § 12-120." The breach of an implied warranty claim by the SunRiver Plaintiffs coupled with the request for fees under "Idaho Code § 12-120" *in* the amended complaint (which presumably incorporates all subsections of that statute) is similar to the reasoning used for awarding fees to the manufacturer in *American West*. Conversely, under *Garner, Terrell, Printcraft Press, Great Plains*, and *Brower*, the indirect relationship between the SunRiver Plaintiffs, VE, and VPS by way of the Equipment Contract does *not* provide a legal basis for fees under section 12-120(3). For these reasons, VE's and VPS's cross-appeal is reasonable and with foundation in law because it calls for distinguishing, overturning, or reconciling case law in tension under section 12-120(3).

## F. Attorney Fees on Appeal and Cross-Appeal

There are competing requests for attorney fees on appeal and cross-appeal. Nevertheless, no party is entitled to fees on appeal or cross-appeal. While the SunRiver Plaintiffs are the prevailing parties for purposes of this appeal, they are not entitled to fees on cross-appeal under Idaho Code section 12-121 because, as explained above, the cross-appeal by VE and VPS regarding fees under section 12-120(3) was not frivolous, unreasonable, or without foundation, where VE and VPS reasonably relied on our decision in *American West*.

VPS is not entitled to attorney fees on appeal against Carillo or the SunRiver Plaintiffs under Idaho Code section 12-121 because VPS is not a prevailing party on appeal. *See Idaho Mil. Hist. Soc'y, Inc. v. Maslen*, 156 Idaho 624, 632, 329 P.3d 1072, 1080 (2014). Similarly, neither VE nor VPS are entitled to fees on appeal or cross-appeal against the SunRiver Plaintiffs under Idaho Code section 12-120(3): VE and VPS did not prevail on appeal, *Knudsen*, 168 Idaho at 274, 483 P.3d at 331, and even if they were to prevail on the merits of their cross-appeal (which we neither reach nor decide today)—the mixed results at this stage would be a basis to deny fees, *see, e.g.*, *Kantor v. Kantor*, 160 Idaho 810, 824, 379 P.3d 1080, 1094 (2016).

To be clear, the district court's decision denying fees below under section 12-120(3) is vacated simply because there is not yet a prevailing party below. Although VE and VPS are *denied* fees on appeal and cross appeal under section 12-120(3), without any potential for a future award of fees for *this* appeal and cross-appeal even if they were to prevail below, neither is foreclosed from requesting fees before the district court for the entire proceedings below under section 12-120(3) should either be a prevailing party below. Notably, this cuts both ways. If the

SunRiver Plaintiffs are prevailing parties before the district court, they are also not foreclosed from requesting fees under section 12-120(3) against VE and VPS for the entire proceedings, excluding this appeal and cross-appeal, as initially requested in their amended complaint.

## IV. CONCLUSION

For the reasons set forth above, the judgment entered in favor of VE and VPS dismissing all claims is vacated; the district court's grant of summary judgment in favor of VE and VPS is reversed; the district court's decision denying attorney fees to VE and VPS under Idaho Code section 12-120(3) is vacated; and these consolidated cases are remanded for further proceedings. Costs are awarded to Carillo and the SunRiver Plaintiffs under Idaho Appellate Rule 40(a).

Chief Justice BEVAN, and Justices STEGNER, MOELLER, and ZAHN CONCUR.